## IN THE UNITED STATES DISTRICT COURT
## DISTRIC OF MASSACHUSETTS

| | |
|---|---|
| STEPHANIE C., | ) |
| | ) |
| Plaintiff, | ) Civil Action No. 1:13-cv-13250-DJC |
| | ) |
| vs. | ) |
| | ) |
| BLUE CROSS AND BLUE SHIELD | ) |
| OF MASSACHUSETTS HMO BLUE, | ) |
| INC. | ) |
| | ) |
| Defendant. | ) |

## PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF HER MOTION FOR SUMMARY JUDGMENT

Plaintiffs Stephanie C. ("Stephanie") and Miles G. ("Miles"), by and through their undersigned counsel and pursuant to F.R.Civ.P. 56, submit the following Memorandum of Points and Authorities in Support of their Motion for Summary Judgment against Defendant Blue Cross and Blue Shield of Massachusetts HMO Blue, Inc. (BCBS).

## INTRODUCTION

This case involves the wrongful denial of payment of medical benefits arising out of residential treatment for a young man suffering from serious mental, emotional, and behavioral disorders. His mother, Stephanie, seeks this Court's order requiring BCBS to pay those medical expenses.

The severity of Miles's problems and his need for treatment is evident from even a quick review of his medical records. Rather than pay those medical expenses, BCBS initially denied them with only a cursory explanation of why it felt the expenses were not covered. In response, Stephanie gathered, among other things, Miles's medical records, statements from various

individuals involved in Miles's treatment, police records, school administrator statements, court records, and a statement from an educational consultant. She presented these materials with a thorough letter outlining Miles's medical history and background and presented that package to BCBS in an appeal of the denied claim. BCBS's response was to provide a second denial letter that provided the same one sentence rationale for denial that was given in the initial denial letter.

BCBS identified no facts in its communications to Stephanie to demonstrate that its denials were reasoned or reasonable. The appropriate standard of review in this case is *de novo*, but under any standard of review, BCBS's denial is unjustified.

I. STANDARD OF REVIEW

A. The Standard of Review In This Case Is *De Novo*

It is well established under ERISA that the standard of review for cases involving denial of ERISA benefits is *de novo* unless there is language in the plan document(s) governing the ERISA plan granting discretion to a fiduciary of the plan to interpret the terms of the plan and to determine eligibility for benefits. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). The First Circuit has recently moved in the direction of requiring that the language necessary to trigger an abuse of discretion standard of review must be clear, precise, and unequivocal in giving notice to insureds that an ERISA plan administrator, such as BCBS, is retaining the discretion "to make a judgment largely insulated from judicial review." Gross v. Sun Life Assurance Co. of Canada, 734 F.3d 1, 16 (1st Cir. 2013).

Gross makes clear that in order to be enforceable, any grant of discretionary authority to BCBS must be contained in either the insurance policy or the "Summary Plan Description" mandated by ERISA. Gross, 734 F.3d at 16. This is necessary because ERISA requires insurers such as BCBS to inform their insureds about circumstances that may result in a denial or loss of

benefits. 29 U.S.C. §1022(b); Bard v. Boston Shipping Association, 471 F.3d 229, 237 (1st Cir. 2006) (ERISA requires that plans provide clear notice to potential claimants of their substantive and procedural rights); Herzberger v. Standard Ins. Co., 205 F.3d 327, 333 (7th Cir. 2000) (". . . employees are entitled to know what they're getting into, and so if the employer is going to reserve a broad, unchanneled discretion to deny claims, the employees should be told about this, and told clearly"). There is no language in any plan document that was distributed to insureds of the Plan to provide any notice that BCBS is retaining discretionary authority to determine eligibility for benefits.

BCBS may argue that the standard of review in this case should be abuse of discretion because the Plan in this case delegated authority to BCBS to determine eligibility for benefits in the Administrative Services Agreement ("ASA") between BCBS and Plan sponsor. The language in the ASA under the heading, "Fiduciary Obligations" is sufficient to trigger discretionary authority. AR 000002. The problem for BCBS is that this delegation of discretionary authority is not found in any document that was ever distributed or routinely made available to the plan participants and beneficiaries, BCBS's insureds, The ASA is certainly a document under which the Plan is established or operated but it is also clearly not a document that is routinely provided to Plan participants. There is no reference to the ASA in the Subscriber Certificate [AR000010-AR000123] and there is no incorporation by reference of the ASA found in the Subscriber Certificate[1].

Because it was never distributed to the Plan participants and beneficiaries, the ASA does not provide insureds with information about any discretionary authority BCBS claims to retain to

---

[1] The Subscriber Certificate included in the Record is the only Plan document included in the Record by BCBS and, for the purposes of this case, must be considered both the "Master Plan Document" and the "Summary Plan Description."

3

determine their eligibility for benefits under the terms of the Plan. Nor did the ASA provide to BCBS insureds any information about what restrictions discretionary authority imposes on judicial review of denied claims. The standard of review this Court should utilize is *de novo*.

 **B.** **If The Court Determines That An Abuse Of Discretion Standard Of Review Is Appropriate, The Court Should Reduce Its Deference Based on BCBS's Conflict of Interest and Procedural Irregularities**

Even if this Court determines that an abuse of discretion standard of review does apply for some reason, BCBS is not automatically entitled to undiluted deference. This Court must examine whether a conflict of interest or serious procedural irregularities require a significant increase in scrutiny.

Insurers of ERISA plans may have the deference normally accorded them under an abuse of discretion standard of review decreased significantly in light of their inherent, structural conflict of interest. Met. Life Ins. Co. v. Glenn, 128 S.Ct 2343, 171 L.Ed.2d 299 (2008). Conflicts of interest may arise, where, as in this case, BCBS is both the decision maker about benefits and the funding source for the payment of those benefits. D&H Therapy Associates L.L.C. v. Boston Mut. Life Ins. Co., 640 F.3d 27, 36 (1st Cir. 2011). In addition, procedural irregularities in BCBS's handling of Miles's claims demonstrate violations of ERISA's claims procedure regulations and highlight BCBS's conflict of interest in the decision-making process. These procedural violations make clear BCBS has not properly taken steps to insulate its decision making process from conflict of interest. Denmark v. Liberty Life Assurance Co. of Boston, 566 F.3d 1, 9 (1st Cir. 2009) ("courts are duty-bound to inquire into what steps a plan administrator has taken to insulate the decision making process against the potentially pernicious effects of structural conflicts")

One of the remarkable aspects of the pre-litigation appeal process in this case is the disparity between the effort Stephanie put into demonstrating the treatment Miles received was medically necessary and the lack of effort to provide any meaningful response or analysis by BCBS to Stephanie. The first denial letter from BCBS to Stephanie, dated May 25, 2012, provided as the only reason for the denial of the claim that, ". . . we have determined that your child's clinical condition does not meet the medical necessity criteria required for an acute residential psychiatric stay in the area of symptoms/behaviors." AR000399. In response, Stephanie presented an extensive appeal letter dated May 20, 2013. AR000401-892. It provided background information and documents about Miles's medical and family history, school performance, and problems with arrests and juvenile proceedings arising out of his behavioral problems. It included many medical records, together with a number of statements from individuals who had provided treatment to Miles, explaining why the mental, emotional, and behavioral care he received at Gateway was medically necessary and qualified for coverage under the Plan.

In response, BCBS sent a letter to Stephanie dated June 19, 2013, denying the claim. AR000898-900. The sum total of its explanation for rejection of Stephanie's appeal is that the doctor at BCBS who reviewed the appeal, ". . . has determined that Miles [sic] clinical condition does not meet the medical necessity criteria required for an acute residential psychiatric stay in the area of symptoms/behaviors." AR000898. This language is almost identical to the unenlightening language of the initial denial letter.

BCBS's failure to engage in a meaningful dialogue with Stephanie during the appeal process and actually consider and respond to the points raised in her appeal violates both BCBS's fiduciary duty to Stephanie and Miles and the claims procedure regulations underlying

ERISA. BCBS failed to provide a full and fair review of the claim as required under ERISA, 29 C.F.R. §2560.503-1(h)(2)(iv) when it did not:

> [p]rovide for a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination.

BCBS's bases for denial of the claim did not change throughout the appeal process and were cursory, at best. In fact, BCBS's denial letters are little more than boilerplate form letters with names and dates adjusted over time. They contain no meaningful information about *why* BCBS believed Miles' conditions did not meet the InterQual® criteria for residential treatment. The denial that followed Stephanie's appeal did not address in any way the arguments and questions raised by her, nor did it comment on the materials included by Stephanie with her appeal. The denial letter was simply a restatement of the opaque language in the original denial of coverage. It provided no additional information or analysis.

The First Circuit has held that ERISA's procedural requirements are designed to provide safeguards to "ensure the objectivity of . . . [the Plan's] administrative appellate review." Bard, 471 F.3d at 240. The regulations underlying ERISA contain specific requirements for group health benefit plans in connection with their claims processing activities. 29 C.F.R. §2560.503-1(g)(v)(B) states that an adverse decision on coverage will include:

> [i]f the adverse benefit determination is based on a medical necessity or experimental treatment or similar exclusion or limit, either an explanation of the scientific or clinical judgment for the determination, applying the terms of the plan to the claimant's medical circumstances, or a statement that such explanation will be provided free of charge upon request.

The regulation requires BCBS to actually engage in meaningful communication with Stephanie and explain *why* it believes that Miles's care was not medically necessary.[2]

29 C.F.R. §2560.503-1(h)(3)(iii) requires that in cases involving decisions about medical necessity, claimants will be provided with information about the identities and credentials of the individuals reviewing the claim for the plan or insurer.

> (3) *Group Health Plans*
>
> The claims procedures of a group health plan will not be deemed to provide a claimant with a reasonable opportunity for a full and fair review of a claim and adverse benefit determination unless, in addition to complying with the requirements of paragraphs (h)(2)(ii) through (iv) of this section, the claims procedures –
>
> . . .
>
> (iii) Provide that, in deciding an appeal of any adverse benefit determination that is based in whole or in part on a medical judgment, including determinations with regard to whether a particular treatment, drug, or other item is experimental, investigational, or not medically necessary or appropriate, the appropriate named fiduciary shall consult with a health care professional who has appropriate training and experience in the field of medicine involved in the medical judgment;
>
> (iv) Provide for the identification of medical or vocational experts whose advice was obtained on behalf of the plan in connection with a claimant's adverse benefit determination, without regard to whether the advice was relied upon in making the benefit determination.

29 C.F.R. §2560.503-1(h)(3)(iii). The initial reviewer ME Kearns, M.D., signed the first denial letter of May 25, 2012 and identified him or herself as the "Physician Reviewer." AR000399. Stephanie requested information about Dr. Kearns and was assured by BCBS in a letter dated April 10, 2013, from Theresa McInerney, that BCBS would send to Stephanie a copy of the CV of any physician reviewing the claim. AR000416. However, by the time Stephanie

---

[2] The terms of the Plan also commit BCBS to providing ". . . the specific medical and scientific reasons for which Blue Cross Blue Shield HMO Blue has denied the request . . .." AR000090.

7

submitted her appeal on May 20, 2013, she had not received the CV for Dr. Kearns from BCBS. *Id.*

The second denial was not signed by a "Physician Reviewer," but by a "Case Specialist." AR000900. Other than the assertion in the June 19, 2013, denial letter that the claim was reviewed by an actively practicing physician who was board certified in Child Psychiatry and Psychiatry, Stephanie received no information about who reviewed her appeal. The name, identity, and specific credentials of the physician referred to in the June 19, 2013, letter have never been disclosed by BCBS. Likewise, the first time any information was provided to the Plaintiffs about Dr. Kearns's credentials was the submission of her CV in the Record by BCBS to this Court prior to briefing[3]. AR000205-000210.

The First Circuit rejected a claimant's request that it join other Circuits in holding that procedural violations shift the standard of review from abuse of discretion to *de novo* review in Bard. Rather, the court in Bard looked specifically at the *consequences* of the procedural violations, concluded that Mr. Bard had been prejudiced by the violations, and held that the remedy for him was an award of the benefits Mr. Bard sought. Id. at 243-246. The court stated that remand to the Plan might be appropriate in some cases of procedural violations but in Mr. Bard's case, "the remaining evidence compels the conclusion that Bard is entitled to benefits." Id. at 246. The same is true in this case. A review of the correspondence between BCBS and Stephanie, it is clear that the claim for benefits was wrongfully denied.

The district court in McCarthy v. Commerce Group, Inc., 831 F.Supp.2d 459,480 (D. Mass. 2011), citing Bard, 471 F.3d at 244, held that:

---

[3] A CV is also included for a Dr. Munir in the Record. AR000195-000204. It is unclear what Dr. Munir's involvement was in the decision-making process involving the Plaintiffs' claims as the denials make no reference to him or her. No document appears in the Record to reflect that he performed any review of Miles' claim.

> Under a deferential standard, procedural irregularities constitute an abuse of
> discretion when they are "serious," have a "connection to the substantive decision
> reached, and call into question the integrity of the benefits-denial decision itself."

BCBS's violations in this matter are equally serious. They were directly connected to the decision to deny Miles' claim and spotlight BCBS' conflicted decision-making process. They demonstrate that BCBS was simply stiff-arming Stephanie.

BCBS never provided any rationale whatsoever for determining that Miles' treatment was not medically necessary. It simply sent boilerplate letters stating that his condition did not meet InterQual® criteria for residential treatment. The only actual information BCBS sent to Stephanie was the InterQual® Review Summary which accompanied the final denial of coverage. AR000901-000903. However, there was no explanation by BCBS about its rationale or methodology used in completing the InterQual Review Summary.[4] This Summary was sent at the same time BCBS said its internal appeal process was completed. AR000899. Failing to provide the Summary to Stephanie before BCBS completed its internal review process obviously ensured that Stephanie had no understanding of the basis for BCBS's denial. She had no access to information from BCBS that would allow her to carry on a meaningful dialogue with BCBS in the pre-litigation appeal process.

Stephanie was unable to directly contest or dispute BCBS' determination that Miles' condition did not meet criteria for residential treatment because BCBS did not give her any information about what specific criteria his conditions did not meet. AR000399. However, she did provide a detailed history of Miles' development. AR000403-000407. Stephanie also provided information about testing and treatment Miles had undergone, copies of medical records, and his school and legal difficulties. AR000407-000410. Stephanie included with her

---

[4] As outlined in Point II, infra, if anything, the Summary seems to demonstrate how clear it was that Miles' condition did meet the criteria for residential admission.

appeal copies of medical records from Gateway and made specific reference to therapy notes indicating the severity of Miles' conditions. AR000410-000413. Stephanie made an itemized list of behaviors which she contended were proof that Miles met the criteria for residential treatment: "Confirmed illegal activity; Persistent violation of court orders; Behaviors present at least 6 mos; Angry outbursts; Aggression; Sexually inappropriate; Irritable Mood; and School refusal." AR000413-000414. Finally, Stephanie concluded her appeal and stated that ". . . it is clear the [*sic*] [BCBS] made a premature utilization review determination without full knowledge of Miles' extensive behavioral health symptoms and treatment history." AR000414. Stephanie pointed out that:

> Dr. Kearns, M.D. did not provide me with any specific references to the medical record that he [*sic*] believed supported his determination that Miles fails to meet the InterQual® Criteria. It is difficult to properly appeal a denial when no meaningful information is provided and, in fact, [BCBS] in [*sic*] required under Federal Law (ERISA) to provide us with specific reasons for the denial.

AR000416.

Stephanie's frustration was evident in her appeal letter. The pre-litigation review and appeal process requires that ERISA plan administrators facilitate a "full and meaningful dialogue regarding the denial of benefits." Glista v. UNUM Life Ins. Co. of America, 378 F.3d 113, 129 (1st Cir. 2004). BCBS's initial and final denial letters stymied Stephanie's ability to get to the bottom of why BCBS was denying the claim. For example, she requested that any further denial of coverage make reference to specific clinical records, discuss why Miles' conditions did not meet criteria, and reiterated her request for Dr. Kearns' CV. *Id*. BCBS failed to provide that information. Likewise, BCBS failed to provide Stephanie with the answers to her questions, "[e]xactly how does the clinical record fail to meet each one of the Interqual® criteria? What additional symptoms or behaviors are missing that should be present in order to determine that

someone does, in fact, meet the criteria?" Id. The failure of BCBS to respond to her questions or provide any reference whatsoever in its June 19, 2013, denial letter to the extensive information Stephanie presented in her appeal "suggests that . . . [Stephanie's] evidence was not considered at all." Bard, 471 F.3d at 242.

Even if BCBS is entitled to some deference to its decision based on the discretionary language in the ASA, the significant procedural violations prejudiced the Plaintiffs and call for, at the very least, significantly reduced deference to BCBS' denial. The procedural violations of ERISA also provide an independent basis for this Court to reverse the denial of benefits and require BCBS to pay Miles' medical expenses. Bard, 471 F.3d at 246.

## II. MILES'S MEDICAL CONDITIONS MET THE PLAN'S DEFINITION OF MEDICAL NECESSITY AND THE INTERQUAL® CRITERIA FOR RESIDENTIAL TREATMENT

While it is well established in ERISA benefit denial cases that BCBS need not grant special weight to a treating physician's opinion, it is likewise clear that BCBS "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." Ortega-Candelaria v. Johnson & Johnson, ___ F.3d ___, 2014 U.S. App. LEXIS 11127, *17 (1st Cir. 2014) (quoting Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003)). In this case, the medical records show that Miles's conditions met the Plan's definition, and the Interqual® criteria, for medical necessity of residential treatment.

The first stage of evaluation in connection with the InterQual® criteria is meeting the "Clinical Indications" for treatment. AR000189. This requires that a patient have a current DSM psychiatric diagnosis and be exhibiting one of a list of behaviors. Miles had been evaluated, assessed, and diagnosed on many occasions throughout his childhood and had a number of DSM diagnoses both prior to, and immediately after, his admission at Gateway. AR000692-000693;

AR000743; AR000239-000240. His diagnoses included 299.80 Asperger's Disorder, 311 Depressive Disorder, NOS, 300.00 Anxiety Disorder NOS, 315.9 Learning Disorder, and NOS (Executive Functioning Problems). AR000743.

As for the Symptoms/Behavior, Dr. Kearns indicated on the InterQual® Review Summary that Miles met the criteria in that his behaviors were "chronic/Persistent Danger to self/others," had been present for at least six months, and were expected to persist longer than one year without treatment. AR000901-000902. As for the list of behaviors, Miles was required only to have one of the behaviors and Dr. Kearns indicated that he did: "sexually inappropriate/aggressive/abusive." AR000902. However, Miles' conditions and symptoms included a number of the symptoms/behaviors on the list including, but not limited to, "Angry outbursts/Aggression" (e.g. AR000242; AR000312; AR000336; AR000385), "Self-mutilation" (e.g. AR000288), and "Arrest/Confirmed illegal activity" (e.g. AR000329; AR000346; AR000542-000557).

The next phase of evaluation under the InterQual® Criteria is to look at "Social Risks." AR000190. There are two categories to be considered: past treatment and the patient's support system. First, the patient must have had unsuccessful treatment within the last year from a list of treatment modalities, it must be impossible to manage the patient's safety at a lower level of care, and the patient must meet one of a list of problems under "support system." *Id*.

In light of the fact that there was no explanation or interpretation provided by BCBS for the InterQual® Review Summary, it isn't entirely clear whether Dr. Kearns qualified Miles under the treatment portion of the Risk criteria or not. However, Miles did meet the treatment criteria. The patient must meet one of a list of unsuccessful treatments, or a combination of treatments, within the prior year. Miles had participated in an intensive outpatient treatment program at

Direction Behavioral Health and had also been "inpatient" in the Vantage Point by Aspiro wilderness treatment program for three months in the year prior to his admission at Gateway. AR000696. His therapists in the Vantage program stated that:

> Miles's complex patterns of executive function, processing speed, working memory, anxiety, emotional and behavioral issues require a specialized and consistent approach. He requires a highly coordinated team approach. . . . It is recommended that Mile transition to a residential treatment center [] skilled in the treatment of children with special academic needs.

AR000693.

The treatment team at Vantage also noted Miles' legal problems with aggressive behaviors directed at both his mother and father on separate occasions, probation terms imposed the courts, and Miles' failure and refusal to comply with court orders and terms of probation, even after agreeing to do so. AR000696.

As for an inability to maintain safety at a lower level of care, Jeffrey Rush, Ph.D. saw Miles while he was receiving treatment at Vantage and completed a comprehensive psychiatric evaluation. Dr. Rush stated that a premature return to home would result, in all likelihood, in a deterioration of Miles' condition and a loss of any progress made during his treatment at Vantage. AR000743.

On the "support system" side of the "Risk" analysis, Dr. Kearns indicated that a viable support system was both "unavailable" for Miles and that his support system was "unable to ensure safety." AR000902.

The last component in the criteria is to determine the appropriate level of care. There are three possibilities for level of care: "Psychiatric Subacute Care/Psychiatric Residential Treatment Center," "Psychiatric Therapeutic Group Home," and " Psychiatric Intensive Community-Based Treatment." Miles was clearly not appropriate for "Psychiatric Intensive Community-Based

Treatment" in that one of the requirements for that level of care is a "safe living environment." AR000190. Dr. Kearns indicated that Miles' support system was unable to ensure his safety. AR000902. The conditions calling for placement in a "Psychiatric Therapeutic Group Home" are not applicable to Miles' situation or conditions: "Emancipated minor lacks independent living skills, demonstrated intolerance for family environment/adult authority and treatment foster care contraindicated, and treatment foster care indicated but unavailable." AR000190.

The last category, subacute residential treatment, was appropriate for Miles because he met all of the requirements *but* one (the criteria require that he meet *only* one): Miles was unable to maintain behavioral control for more than 48 hours and improvement was not expected within two weeks (see, e.g., monthly treatment summaries and individual treatment notes at AR000251, AR000258, AR000273, AR000274, AR000294, AR000300, AR000308, etc.), he was socially withdrawn (e.g. AR000255, AR000257, AR000289, AR000324, AR000335, AR000385, AR000426, AR000274), and he was unable or unwilling to follow instructions (AR000247, AR000271, AR000288, AR000308, AR000318, AR000321). The only condition he didn't meet was an inability to take care of his own "ADLs [activities of daily living]."

In conclusion, there is no reason to think Miles's serious mental, emotional, and behavioral problems did not meet the Interqual® review criteria. Both Miles's medical records and the Summary completed by BCBS demonstrate that he satisfied the criteria. BCBS's denial based on that criteria is completely unjustified.

//
//
//

III. **THE PLAINTIFFS ARE ENTITLED TO PAYMENT OF THE BENEFIT DUE THEM UNDER THE TERMS OF THE PLAN, AN AWARD OF PREJUDGMENT INTEREST AND ATTORNEY FEES**

    A. **The Plaintiffs Are Entitled to Payment For Miles's Treatment**

BCBS failed and refused to provide coverage and payment for Miles's treatment. Plaintiffs are entitled to payment of the full billed charge from Gateway for the full extent of Miles' treatment from January18, 2011, through June, 2013.

    B. **The Plaintiffs Are Entitled To An Award Of Prejudgment Interest And Attorney Fees Under U.S.C. §1132(g)**

The Plaintiffs request that the Court reserve consideration of the issue of prejudgment interest and attorney fees pending a decision in their favor on the merits. At such time, Plaintiffs request an opportunity to present information to the Court in connection with their right to an award of prejudgment interest and attorney fees.

RESPECTFULLY SUBMITTED this 30th day of July, 2014.

    /s/ Jonathan M. Feigenbaum
Jonathan M. Feigenbaum, Esq.
B.B.O. #546686
184 High Street
Suite 503
Boston, MA 02110
Tel. No. : (617) 357-9700
Jonathan@erisaattorneys.com

    s/ Brian S. King
Brian S. King, Esq.
Utah Bar #4610, admitted *pro hac vice*
336 South 300 East, Suite 200
Salt Lake City, UT 84111
Tel. No. : (801) 532-1739
brian@briansking.com

## CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants identified by the Court and there are no non-registered participants.

                                             /s/ Jonathan M. Feigenbaum