## IN THE UNITED STATES DISTRICT COURT
## DISTRIC OF MASSACHUSETTS

| | |
|---|---|
| STEPHANIE C., | ) |
| | ) |
| Plaintiff, | ) Civil Action No. 1:13-cv-13250-DJC |
| | ) |
| vs. | ) |
| | ) |
| BLUE CROSS AND BLUE SHIELD | ) |
| OF MASSACHUSETTS HMO BLUE, | ) |
| INC. | ) |
| | ) |
| Defendant. | ) |

## PLAINTIFF'S RULE 56.1 STATEMENT

1. Plaintiff Stephanie C. is the custodial parent of Miles G. ("Miles"). Complaint [docket #1], ¶ 1.

2. Miles' father is a participant in a group health benefit plan ("the Plan") sponsored by his employer and insured by Blue Cross and Blue Shield of Massachusetts HMO Blue, Inc. ("BCBS"). Miles is a beneficiary of the Plan. Complaint, ¶ 1; Answer [docket #8], ¶ 1.

### Terms of the Plan

3. The employer sponsoring the Plan has contracted with BCBS to insure and administer the Plan including processing and paying claims, making determinations about medical necessity, and reviewing any appeals of denied claims from Plan participants and beneficiaries, BCBS insureds. The document outlining the rights and responsibilities of the Plan and BCBS is an administrative services agreement ("ASA") entitled "Premium Account Agreement" and includes a delegation of discretionary authority from the Plan to BCBS. AR000001-AR000009.

4. The Plan provides coverage for its insureds who obtain health care outside of Massachusetts under the BlueCard program. AR000005; AR000023.

5. The Plan covers treatment for mental health services for conditions included in the Diagnostic and Statistical Manual of Mental Disorders ("DSM"). AR 000032.

6. The Plan requires "pre-admission review" of non-emergency inpatient care. AR000041.

7. "Inpatient" is defined by the Plan to include residential treatment. AR000030.

8. In order to qualify for coverage, treatment must be "medically necessary." The Plan defines "medically necessary" or "medical necessity" as:

> All health care services must be required services that a health care provider, using prudent clinical judgment, would provide to a patient in order to prevent or to evaluate or to diagnose or to treat an illness, injury, disease, or its symptoms. And, these health care services must also be:
>
> - Furnished in accordance with generally accepted standards of professional medical practice (as recognized by the relevant medical community);
> - Clinically appropriate, in terms of type, frequency, extent, site, and duration; and they must be considered effective for your illness, injury or disease;
> - Consistent with the diagnosis and treatment of your condition and in accordance with *Blue Cross Blue Shield HMO Blue medical policies* and *medical technology assessment criteria*;
> - Essential to improve your net health outcome and as beneficial as any established alternatives that are covered by *Blue Cross Blue Shield HMO Blue*;
> - Consistent with the level of skilled services that are furnished and furnished in the least intensive type of medical care setting that is required by your medical condition; and
> - Not more costly than an alternative service or sequence of services at least as likely to produce the same therapeutic or diagnostic results to diagnose or treat your illness, injury, or disease.

AR000031-32 (emphasis in original).

9. The Plan provides coverage for biologically based mental conditions, *e.g.* schizophrenia, bipolar disorder, obsessive compulsive disorder, autism, etc. The Plan also covers treatment for non-biologically based mental health conditions for children under the age of 19 such as conditions that "interfere with or limit the way the child functions or how he or she interacts with others." AR000057.

10. The Plan also includes a Rider that specifically outlines coverage for treatment of "Autism Spectrum Disorders." AR000115.

11. The Plan's "Schedule of Benefits" provides that inpatient mental health care from an out-of-network provider will be covered with a 20% coinsurance payment from the participant after the annual deductible is reached. AR 000119.

12. The Plan utilizes criteria developed by Interqual® ("RT criteria") to evaluate medical necessity of residential treatment for adolescents. AR000399.

13. The RT criteria include a description of what residential treatment is and what requirements must be met by a residential treatment facility to qualify for coverage. The requirements include, but are not limited to, a preliminary psychiatric evaluation with monthly updates; a psychosocial assessment and substance evaluation; individual/group/family therapy at least once each week; development of a multidisciplinary treatment plan; development of a preliminary discharge plan; and 24 hour adult supervision with medical staff available as needed on a 24-hour basis. AR000442.

14. The Plan's evaluation of medical necessity begins with establishing that the patient's clinical indications within the last week are met: that the patient has at least one

mental health diagnosis found in the DSM and one of the following symptoms/behaviors:

- Chronic/Persistent danger to self/others, **ALL**
  * Behaviors, **ONE**
    *Fire setting
    * Self-mutilation
    *Runaway for more than **24h**
    *Daredevil/impulsive behavior
    *Sexually inappropriate/aggressive/abusive
    *Behaviors, unmanageable, **ONE**
      *Angry outbursts/Aggression
      *Positive psychotic symptoms
      *Habitual substance use, **ONE**
        *Anxiety *and* associated symptoms increasing
         Depressed/Irritable mood *and* associated
         symptoms increasing
        * Hypomanic symptoms increasing
  * Behaviors present at least **6 mos**
  *Behaviors expected to persist longer than **1 yr w/o** treatment

AR000439 (emphasis in original).

15. The next step in the analysis evaluates "Social Risks." The patient must meet one of the following requirements: unsuccessful in treatment within the past year in either a foster care setting, a residential treatment or therapeutic group home setting, or in intensive community based treatment; or have had at least three psychiatric inpatient admissions, three psychiatric partial hospitalization admissions, or four psychiatric admissions to inpatient/partial hospital/intensive outpatient in any combination. AR000440.

16. The patient must also be "unable to be managed safely at less intensive level of care." *Id.*

17. The other aspect of social risks that is considered is availability of a viable support system and the patient's environment must meet one of following conditions: a

4

support system is 1) unavailable; 2) unable to ensure safety; 3) involves a high-risk environment; 4) is abusive; 5) involves intentional sabotage of treatment; or 6) is unable to manage the intensity of the patient's symptoms. *Id.*

18. Finally, after consideration of both the clinical indications and the social risks, the appropriate level of care is determined to be either "psychiatric subacute care/psychiatric residential treatment center," "psychiatric therapeutic group home," or "psychiatric intensive community-based treatment." *Id.*

19. Treatment is indicated at a psychiatric residential treatment center if one of the following criteria is met: 1) the patient is unable or unwilling to follow instructions or take care of his needs; 2) the patient is socially withdrawn; 3) the patient is unable or unwilling to perform activities of daily living; or 4) the patient is unable to maintain behavioral control for more that 48 hours and improvement is not expected within a two week period. *Id.*

20. The RT criteria also include notes specifically describing each of the various terms used in the assessment process. For example, one of the clinical elements, "sexually inappropriate, aggressive, or abusive behaviors," is described as referring to:

> The child's or adolescent's sexual behavior toward not only another child or adolescent, especially when the patient is older, but also towards family members, adult treaters, or caregivers. This behavior can include noncontact acts (e.g. sexually inappropriate play with inanimate objects, sexual comments, exhibitionism, masturbating in front of another); sexual contact (e.g. inappropriate rubbing or touching of others, inducing another to touch offender's intimate parts); or penetration (e.g., digital, penile, or object).

AR000441.

21. The "Grievance Program" provisions of the Plan states that when an insured appeals a denied claim, BCBS "will research the case in detail. They will ask for more information if it is needed." AR000089.

22. The Plan details what information will be provided to insureds when BCBS maintains, in whole or in part, its denial of coverage. In that case BCBS will:

> . . . . send an explanation to you. This notice will include: information relating to the details of your grievance; the reasons that Blue Cross Blue Shield HMO Blue has denied the request and the applicable terms of your coverage in this health plan; the specific medical and scientific reasons for which Blue Cross Blue Shield HMO Blue has denied the request; any alternative treatment or health care services and supplies that would be covered; Blue Cross Blue Shield HMO Blue clinical guidelines that apply and were used any review criteria; and how to request an external review.

AR000090.

23. External review through the Office of Patient Protection is not required under the Plan. AR000091.

**Miles G.'s Developmental and Treatment History**

24. Miles began experiencing difficulties as a baby. He was clingy, fearful, highly irritable, impulsive, and aggressive. His first preschool requested a psychiatric evaluation for Miles after his first two months of enrollment. AR000403.

25. Miles continued to have problems and various solutions were attempted including, but not limited to, a "home program sensory diet," a behavioral modification program, a behavioral chart, and Miles eventually had to be home schooled for a year because his public school was not equipped to deal with his aggression, agitation, anxiety, and fearfulness. AR000404.

26. Stephanie tried for years to find appropriate professional help for Miles but no one was able to provide any answers about Miles' conditions or how to address them. Stephanie eventually read a book called "The Explosive Child" and arranged a meeting with the author of the book, Ross Greene, M.D. Dr. Greene evaluated Miles and said that although his symptoms could fit into a number of different psychiatric diagnoses, Miles was too young for a conclusive diagnosis. *Id.*

27. Stephanie continued to seek help for Miles and he participated in various therapeutic treatments and was prescribed a variety of psychotropic medications to address his serious symptoms. Miles was admitted to a study of pediatric bipolar disorder at the age of seven. The medications prescribed in the study were mildly beneficial but Miles was unable to continue in the study because the dosages recommended for him exceeded the study protocol. AR000405.

28. Miles was eligible for special education services at school and had an aide with him at all times during the school day to help him manage his moods and behaviors. *Id.*

29. Miles began refusing to attend school when he was in eighth grade. His aggression toward his family members was escalating and as he got older and bigger, this was becoming more dangerous for his family. AR000405.

30. By 2010, Miles was in intensive outpatient treatment but his conditions and behavior did not improve. He continued to be aggressive and was also sexually inappropriate. Miles was arrested in both August of 2010 and September of 2010 for assaulting Stephanie and his father. AR000406.

31. Stephanie realized that she simply could not ensure safety for herself or Miles' younger brother and that she could not continue trying to control Miles' behaviors.

She enrolled Miles in Vantage Point of Aspiro ("Aspiro"), a wilderness therapy program for teens with neurodevelopmental problems along with psychological, emotional, and behavioral conditions. *Id.*

32. After three months at Aspiro, Miles' discharge "diagnostic impressions" were 299.80 Asperger's Disorder, 314.00 Attention Deficit/Hyperactivity Disorder Predominantly Inattentive Type, and 300.00 Anxiety Disorder NOS. AR000692.

33. The "Discharge Summary and Recommendations" stated that:

> Miles's neurodevelopmental, executive function, anxiety, identity, behavioral and family issues are indeed complex. He displays significant deficits in the areas of executive function. . . .
>
> Miles's complex patterns of executive function, processing speed, working memory, anxiety, emotional and behavioral issues require a specialized and consistent approach. He requires a highly coordinated treatment team approach.

AR000692-000693.

34. Miles was admitted at Gateway on January 18, 2011. AR000406.

35. A "Psychiatric Evaluation" was completed for Miles and his diagnoses were:

> AXIS I     Mood disorder, NOS 296.00
> Anxiety disorder, NOS 300.00
> Autism Spectrum Disorder - Asperger's
> Cognitive disorder, NOS
> Parent-child relational problem
>
> AXIS II     No diagnosis
>
> AXIS III     No diagnosis
>
> AXIS IV     Divorce, father's remarriage, father's recent move to a new home, lack of a peer support group, recent placement in a wilderness program, and current placement in a residential program

AR000240-000241.

36. A "Master Treatment Plan" was developed for Miles with specific methodologies proposed to assist Miles in improving mood and anxiety management. AR 000241.

37. Miles experienced slow progress with intermittent successes and setbacks during his treatment at Gateway. During his first weeks in the program, Miles was very resistant to participating in therapy, angry about being in the program, and during individual, group and family therapy sessions, was defensive, angry and anxious. *See*, AR000242-000246.

38. When Miles became frustrated, he shouted profanities and told both staff and peers to leave him alone. AR000247.

39. The treatment plan for Miles was reviewed on April 27, 2011. The review reported "good progress towards [Miles'] goal of improved mood and anxiety management" and noted "improved social functioning in school and in the milieu." The review went on to discuss Miles' desire for peer relationships but his struggle because of his lack of skills in that area. In working with Miles on this issue, the treatment team had structured interventions specifically aimed at helping Miles develop the skills he needed for successful peer interaction. AR000274.

40. Miles had an incident involving self-harm on April 28, 2011. AR000288.

41. Miles had consistently refused any kind of medication to assist him with mood and anxiety management. On May 5, 2011, during a medical review, it was noted that although Miles was struggling with mood stability, he was maintaining his refusal of medication. AR000290; AR000292.

42. Miles experienced some successes in learning to intervene when his moods or anxiety were becoming problematic. *See*, AR000300; AR000304; AR000314.

43. One of Miles' consistent difficulties, both before his admission at Gateway and during treatment, was engaging in inappropriate sexual talk and behavior. For example, during a home visit, Miles surfed the internet looking for pornography or films with sexual content. *See,* AR000308; AR000309; AR000324; AR000329 AR000333.

44. In addition, while on a home leave, Miles had consumed alcohol and shoplifted various items. *Id.*

45. As a result of his behavior, Miles was stepped down in the program at Gateway. He was very angry about having to earn his way back up through the program stages. Miles blamed his bad behavior on "depression." AR000336; AR000338.

46. It was also becoming clearer to Miles' therapists that he had difficulty empathizing with and caring about others. AR000339; AR000341.

47. During an outing to a local recreational facility, Miles groped a young female lifeguard. Miles was required to write a letter of apology to the young woman, but Miles' therapists questioned the sincerity of the apology. *See*, AR000350; AR000352-000353.

48. The next review of the master treatment plan recorded a number of instances of problem behavior, including the sexual misconduct, of which Gateway staff had been unaware. Miles' therapists were alarmed at the "thinking errors" leading to Miles' behaviors and referred him for an expert evaluation with Michelle Gourley[1]. AR000352-000353.

---

[1] Ms. Gourley is one of the owners and founders of Gateway, and also maintains a private practice specializing in assessment and treatment of adolescents with brain-based, developmental, trauma-focused, and sex-specific paradigms. Ms. Gourley has master's degrees in both social work and marriage and family therapy, is a licensed clinical social worker, and is also

49. Miles' therapists were questioning the root of Miles' lack of empathy and needed more assessment in connection with his Asperger's diagnosis as well as a possible trauma history. Miles had revealed that he witnessed a babysitter sexually abusing Miles' younger brother. *Id*.

50. It was eventually discovered that Miles was also abused by the baby sitter and the appropriate law enforcement organization was notified. AR000369.

51. Miles continued to experience occasional violent emotional outbursts and struggled with taking the next step in his therapeutic program. He continued to make excuses and avoid taking responsibility for his behaviors and choices. AR000385.

52. However, Miles was making some progress in recognizing and controlling his impulsive and destructive behaviors. AR000387.

53. In March of 2012, when Miles had been in treatment for over a year, he was still having difficulty managing his mood and anxiety and was still volatile and destructive. Miles had threatened to kill himself during a family therapy session when limits were set that frustrated him. AR000886.

54. Miles was discharged from Gateway in August of 2012, and moved to a therapeutic boarding school in Kalispell, Montana where he could continue to receive the strong, multidisciplinary therapeutic treatment and support he required. AR000868.

### BCBS' Denial of Coverage and Stephanie's Appeal

55. Claims were submitted to BCBS for payment of Miles' medical expenses incurred during his treatment at Gateway. *See*, AR000157-000188.

---

an attorney specializing in juvenile and family law. www.gatewayacademy.net, last viewed 7/21/2014.

56. BCBS formally denied coverage for Miles on May 25, 2012. BCBS' denial letter stated that InterQual® criteria had been utilized to evaluating medical necessity and BCBS had determined that "your child's clinical condition does not meet the medical necessity criteria required for an acute residential psychiatric stay in the area of symptoms/behaviors." The denial letter was signed by ME Kearns, M.D. and indicated Dr. Kearns' position as "Physician Reviewer." AR000399.

57. Stephanie appealed the denial on May 20, 2013. In her letter, Stephanie provided a detailed history of Miles' development, testing and interventions that had been done for him, his legal history and school district information. Stephanie also included with her letter voluminous medical records, testing evaluations and results, letters of recommendation from several of Miles' treating physicians and therapists, and other records relevant to Miles' condition. AR000402-AR000892.

58. In her letter, Stephanie pointed out that no specific information had been included in the BCBS denial to help her understand the basis for BCBS' position that Miles' conditions did not meet the InterQual® criteria. She noted that both ERISA and Massachusetts State Insurance law require that insurers provide *specific* information about the basis for a denial of coverage. Stephanie also reiterated a request for the *curriculum vitae* of Dr. Kearns who had reviewed the claim and applied the criteria in evaluating the claim. Finally, Stephanie requested that in the event BCBS chose to maintain its denial, that she be provided with reference to the specific clinical records on which BCBS was relying to determine that denial of the claim was appropriate. AR-000416.

59. On June 19, 2013, BCBS wrote to Stephanie and maintained its denial of coverage. BCBS again stated that Miles met medical necessity criteria for outpatient coverage but not for an "acute residential psychiatric stay." The letter stated that a different reviewer not involved in the original denial, an individual board certified in child psychiatry, had completed the evaluation of the claim. The letter did not identify the physician reviewer for Stephanie's appeal and BCBS did not include *curriculum vitae* for either of the reviewers. The letter included no analysis, provided no facts on which its denial rationale was based, and made no reference to any of the medical records provided to BCBS by Stephanie and Gateway. AR000898-AR000900.

60. However, the letter did include an "InterQual® Review Summary" ("IRS"). The IRS contained information about the "Requested Level of Care" as "Psychiatric Residential Crisis Program," and the "Recommended Level of Care," which was noted to be "Psychiatric Subacute Care." The IRS also indicated that the file had been referred for "Secondary-Medical" and the reasons for the referral were listed as "Clinical Complexity, Delay in discharge planning, Is this Custodial, Not medically necessary/alternative level of care more appropriate." The reviewer who prepared the IRS was identified as Elyce Kearns. AR000901.

61. The IRS then goes on to include the residential treatment criteria met by Miles as follows:

> ✓ **CLINICAL INDICATIONS [Both]**
>> ✓ **Current DSK-IV-TR® psychiatric diagnosis [One]**
>>> ✓ Potential for improvement in symptoms/behavior with treatment (2)[2]

---

[2] The parenthetical numbers refer to notes included with the IRS which provide more detail about the terms and requirements of the criteria.

- ✓ Treatment expected to maintain symptoms/behavior *w/o* further deterioration (3)

- ✓ **Symptoms/Behavior [One] (4)**

    - ✓ Chronic/Persistent danger to self/others **[All]**

        - ✓ Behaviors **[One]**

            - ✓ Sexually inappropriate/aggressive/abusive (5)(6)

            - ✓ Behaviors present at least **6 mos**

            - ✓ Behaviors expected to persist longer than **1 yr** *w/o* treatment

- ✓ **RISKS [One]**

  - ✓ SOCIAL RISKS [**Both**]

    - ✓ **RISKS [Both]**

        - ✓ **Treatment Hx [Both]**

    **Organizational Policy:**
    Blue Cross Blue Shield of MA will consider any combination of 2 or more psychiatric admissions within the last year to inpatier [*sic*]

            - ✓ Unsuccessful treatment *w/in* last **yr** {**One**] (7)

                - ✓ Intensive community based treatment (8)

            - ✓ Unable to be managed safely at less intensive level of care

        - ✓ **Support System [One]** (9)

            - ✓ Unavailable (10)

            - ✓ Unable to ensure safety

    - ✓ **Level of Care [One}**

        - ✓ Psychiatric Subacute Care [One]

    **Organizational Policy:**

Blue Cross Blue Shield of MA uses the Psychiatric Subacute Care level of care criteria exclusively for Adolescent ART

> ✓ **Functioning {One]**
>
> > ✓ Discharge/Transfer from psychiatric hospitalization *w/in* last **24h {One]**
> > ✓Profound functional impairment (11)

AR 000901-000903 (emphasis in original).

62. The BCBS denial letter included no explanation about how the IRS had been completed, how it was compiled, and, in fact, makes no reference to the IRS at all. AR000898-000900.

DATED this 30th day of July, 2014.

   /s/ Jonathan M. Feigenbaum
Jonathan M. Feigenbaum, Esq.
B.B.O. #546686
184 High Street
Suite 503
Boston, MA 02110
Tel. No. : (617) 357-9700
Jonathan@erisaattorneys.com

   s/ Brian S. King
Brian S. King, Esq.
Utah Bar #4610, admitted *pro hac vice*
336 South 300 East, Suite 200
Salt Lake City, UT 84111
Tel. No. : (801) 532-1739
brian@briansking.com

## CERTIFICATE OF SERVICE

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants identified by the Court and there are no non-registered participants.

                                    /s/ Jonathan M. Feigenbaum