IN THE UNITED STATES DISTRICT COURT
DISTRIC OF MASSACHUSETTS

| STEPHANIE C., | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | Civil Action No. 1:13-cv-13250-DJC |
| | ) | |
| vs. | ) | |
| | ) | |
| BLUE CROSS AND BLUE SHIELD | ) | |
| OF MASSACHUSETTS HMO BLUE, | ) | |
| INC. | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiffs Stephanie C. ("Stephanie") and Miles G. ("Miles"), by and through their undersigned counsel and pursuant to F.R.Civ.P. 56, submit the following Memorandum of Points and Authorities in Opposition to Defendant Blue Cross and Blue Shield of Massachusetts HMO Blue, Inc.'s ("BCBS") Motion for Summary Judgment. The Plaintiffs' Response to "Blue Cross' Statement of Facts" is submitted concurrently with this Memorandum.

**ARGUMENT**

**I.    STANDARD OF REVIEW**

**A.    The Premium Account Agreement Grant Of Discretion Is Insufficient To Trigger An Abuse Of Discretion Standard Of Review**

As argued by the Plaintiffs in their opening Memorandum, the appropriate standard of review in this case is *de novo* in light of the fact that the language granting BCBS discretion to determine eligibility for benefits is not found in a document that provides notice to Plan participants and beneficiaries of that discretion. BCBS relies, in part, on this Court's holding in Bonanno v. Blue Cross and Blue Shield of Massachusetts, Inc., 2011 U.S. Dist. LEXIS 118825

(D. Mass. 2011) to argue that an abuse of discretion standard applies. However, the situation in Bonanno was not analogous to the situation in this case and, in fact, the Court's decision in Bonanno supports the Plaintiffs' position here and calls for a *de novo* review.

This Court held that "[a] benefits plan *'must clearly'* grant discretionary authority to the administrator for its decision to be entitled to deference." Bonanno, 2011 U.S. Dist. LEXIS at *18, citing Rodriguez-Abreu v. Chase Manhattan Bank, N.A., 986 F.2d 580, 583 (1st Cir. 1993) (emphasis added in Bonanno). The Court went on to point out the inclusion of discretionary language in both the Plan itself and in the summary plan description ("SPD") in Bonanno. Id. at *21-23. There is no such clear grant of discretion in a master plan document or SPD here. The only grant of discretion to BCBS by the Plan found in any document in this case is in the "Premium Account Agreement" ("PAA"), an administrative services agreement between the employer sponsoring the Plan and BCBS. AR000002. There is nothing in the Record to indicate that BCBS or the Plan ever distributed the PAA to Plan participants and beneficiaries and, given the nature and purpose of the PAA, there is no reason to think it would be distributed.

BCBS also argues that the language included in the SPD in Bonanno -- "Blue Cross and Blue Shield decides which covered services are medically necessary and appropriate for you" -- is the same as language found in the Subscriber Certificate in this case: BCBS Memo, p. 5. However, this is not the language the Court relied on to provide the "clear" grant of discretion in Bonanno. Rather, the SPD in Bonanno included the following:

> Blue Cross, as claims administrator, has "the authority to make final decisions with respect to paying claims" and "full discretionary power to interpret the meaning of plan provisions and determine questions arising under the plan, including, but not limited to, eligibility for benefits.

Bonanno, 2011 U.S. Dist. LEXIS at *21-22. The information conveyed to the plan participants by the language in the Bonanno SPD is qualitatively different from the self-evident statement

2

that BCBS will make decisions about what services are medically necessary when claims for coverage are submitted. "Interpretation of terms of a plan and determination of the validity of claims are not, in themselves, discretionary functions." Rodriguez-Abreu, 986 F.2d at 583. The First Circuit in Gross v. Sun Life Assurance Company of Canada, 734 F.3d 1 (1st Cir. 2013), also makes clear that the language in the Plan in this case is insufficient to confer discretion on BCBS. "[W]e conclude that language providing proof of disability "satisfactory to us" is inadequate to confer the discretionary authority that would trigger deferential review." Id, at 2 (1st Cir. 2013).

The language in the Plan that informs Stephanie that BCBS will evaluate her claims for coverage when she submits them and make decisions about whether or not to pay to claims does not provide Stephanie with any meaningful information at all. It certainly doesn't disclose to her that, in the event her claims are denied and she chooses to pursue those claims in litigation, the court's review of BCBS' decision will defer to BCBS' judgment and be limited to a determination about whether or not there was any reasonable basis for the denial.

The other cases relied on by BCBS to support its position that an abuse of discretion standard of review applies in this case are more akin to Bonanno than they are to this case, in that each included very clear grants of discretion in plan documents disclosed to plan participants and beneficiaries[1]. In light of the absence of clear language containing discretionary authority in documents provided to the participants and beneficiaries of the Plan, the standard of review is *de novo*.

      **B.**    **BCBS' Inherent Conflict Of Interest Affects The Standard Of Review**

---

[1] Gernes v. Health and Welfare Plan of Metropolitan Cabinet, 841 F.Supp.2d, 502, 508 (D. Mass. 2012) (grant of discretion in plan document was "undisputed"); Jon N. v. BlueCross BlueShield of Massachusetts, Inc., 684 F.Supp.2d 190, 199 (D. Mass. 2010) (plan included language making

As discussed in the Plaintiffs' opening memorandum, insurers who both evaluate claims for benefits and pay those benefits operate under an inherent conflict of interest. Met. Life Ins. Co. v. Glenn, 128 S.Ct 2343, 171 L.Ed.2d 299 (2008). The court has held that insurers like BCBS can mitigate this inherent conflict by "employing a neutral, independent review process, or segregating employees who make coverage decisions from those who deal with the company's finances." Petrone v. Long Term Disability Income Plan, 935 F.Supp. 2d 278, 288 (D. Mass. 2013), citing Harlick v. Blue Shield of Cal., 686 F.3d 699, 707 (9th Cir. 2012).

BCBS argues that it took the steps recommended by the district court to employ a neutral review process by directly offering the option of an external review to the Plaintiffs. BCBS Memo, p. 5. However, the option for external review is available to any insured in the State of Massachusetts (105 CMR 128.400) and, in fact, the option for external review is mandated under the Patient Protection and Affordable Care Act ("PPACA"). The fact that BCBS complied with its obligations under Massachusetts insurance regulations and the PPACA proves nothing in connection with a reduction in BCBS's internal conflict.

There was nothing in BCBS's denial letters to indicate that Dr. Kearns (AR000399) or the unidentified physician reviewer (AR 000898-000900) were anything other than BCBS employees. Even if not regularly or permanently employed by BCBS, Dr. Kearns and the second reviewer were retained by BCBS and paid for their reports and opinions. How that review process can be characterized as "neutral" or "independent" is difficult to understand. BCBS provides the information to its reviewers, frames the questions for its reviewers, and pays the reviewers for their opinions. Stephanie had no input whatsoever into the review process, other than the written appeal she submitted to BCBS.

The district court held in <u>Petrone</u> that the potential conflict was "attenuated 'perhaps to the vanishing point'" by actions taken to segregate the "relevant actors" but, even with evidence of significant attempts to reduce conflict in that case, the court concluded by stating, "I view the Plan's decision with skepticism 'commensurate' to the potential conflict of interest." <u>Petrone</u>, 935 F.Supp.2d at 290, citing <u>Nolan v. Heald College</u>, 551 F.3d 1148, 1153 (9th Cir. 2009). In the event the Court determines an abuse of discretion standard of review is proper in this case, it is appropriate for the Court's deference to BCBS' decision to be reduced to account for the inherent conflict of interest.

**C. BCBS' Violations of ERISA's Claims Processing Regulations Call For A *De Novo* Review**

BCBS also argues that any procedural violations during the pre-litigation appeal process could not justify an award of benefits to the Plaintiffs in this case. BCBS then states that it provided sufficient information to Stephanie in its denials to allow her to adequately prepare her appeals. BCBS claims that:

> In communication with Miles' family and provider, Blue Cross explained that the claim for long-term residential care was denied because the Plan did not cover treatment provided in a school setting; because Miles' parents failed to obtain Blue Cross' approval in advance; because treatment was not furnished in the "least intensive" type of medical care setting that was appropriate; and because Blue Cross had determined the admission not to be medically necessary.

BCBS Memo, p. 11. Even the most cursory review of the denial letters from BCBS demonstrates that this statement is inaccurate. The Explanations of Benefits provided to Stephanie may have arguably included some of the alleged bases for denial[2]. But the BCBS

---

[2] There are no Explanations of Benefits included in the Record. The documents included at AR000216-000156 appear to be records internal to BCBS relating to generation of Explanations of Benefits. The first page entitled "Message Listing" does seem to indicate as bases for denial: claim doesn't meet medical necessity; subscriber's plan does not include benefits for treatment

5

denials in both the first letter of May 25, 2012 and the second letter of June 19, 2013, were based on one thing only -- BCBS's position that Miles' condition did not meet InterQual® criteria for medical necessity. AR000399.

29 U.S.C. §1133 requires that ERISA plans:

(1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and

(2) afford a reasonable opportunity to any participant who claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

This section of ERISA, titled "Claims Procedure," is fleshed out by the terms of 29 C.F.R. §2560.503-1, ERISA's claims procedure regulations. BCBS violated a number of these regulations.

> A member of [a Plan] is entitled to notice from the [Plan] of the reason for the denial of a benefit. There are at least two reasons for the requirement. First, notice can provide the member with information necessary for him or her to know what he or she must do to obtain the benefit. Second, if the [Plan] persists in its denial, notice can enable the member effectively to protest that decision.

Juliano v. HMO of N.J., Inc., 221 F.3d 279, 287 (2nd Cir. 2000).

BCBS provided no rationale or analysis to Stephanie which would enable her to either obtain the benefit or protest BCBS' decision. She simply didn't know why BCBS believed Miles didn't meet the criteria for residential treatment. She provided volumes of material, including medical records, legal records and school records, with her appeal to assist BCBS in appreciating

---

claimed; service authorized as "observation" and billed as "inpatient;" and care provided in educational, vocational, or recreational setting not covered." AR000144. The second "Message Listing" also included lack of medical necessity but otherwise provided different bases for denial: benefits not available because Medicare is the primary coverage for claimant, contract does not cover emergency services unless they are within 72 hours of emergency, and benefits not available for experimental treatment. AR000153. There is no reference whatsoever to any alleged failure to pre-certify the treatment as a basis for denial.

the severity of Miles' long-standing conditions. BCBS' responses were boilerplate denials which, in the case of the second denial, failed to even identify the physician reviewer by name.

The First Circuit discussed the question of procedural violations at length in <u>Glista</u>, noting that "Congress gave the federal courts a range of remedial powers" in connection with those violations. <u>Glista</u>, 378 F.3d at 131 (1st Cir. 2004). In this case, as in <u>Glista</u>, inadequate information was provided to Stephanie about the bases for BCBS' denial, the insurer raised bases for denial for the first time in litigation (the Plaintiffs address that specific issue below), and the insurer violated the terms of the plan. <u>Id</u>. at 131-132. In this case, as in <u>Glista</u>, the appropriate equitable relief is an award of the benefits owed Stephanie and Miles under the terms of the Plan.

BCBS's initial denial in May of 2012 simply stated that "we have determined that your child's clinical condition does not meet the medical necessity criteria required for acute residential psychiatric stay in the area of symptoms/behaviors." AR000399. BCBS provided no additional information about which component of the "symptoms/behaviors" section of the criteria Miles allegedly didn't meet. Stephanie was not in a good position to intelligently appeal the denial when she had no way of knowing what its actual basis was.

Other Circuits are in accord with the First Circuit ruling in <u>Glista</u>. In <u>Gilbertson v. Allied Signal, Inc.</u>, 328 F.3d 625, 635 (10th Cir. 2003) (citing <u>Booton v. Lockheed Medical Benefit Plan</u>, 110 F.3d 1461, 1463 (9th Cir. 1997)), the Tenth Circuit stated:

> In simple English, what this regulation calls for is a meaningful dialogue between ERISA plan administrators and their beneficiaries . . . There is nothing extraordinary about this: it is how civilized people communicate with each other regarding important matters.

<u>Id</u>. BCBS was required to provide Stephanie with sufficient information about its rationale for denying the claim to allow Stephanie to perfect his claim.

In spite of BCBSs failure to identify the basis for its denial of the claim, Stephanie did submit an appeal and raised specific arguments about why she believed the denial was incorrect. When BCBS responded to Stephanie's appeal, it failed to address in any way the substance of her appeal or the voluminous documentation she had provided to support payment of Miles' claim. BCBS' failure to substantively respond to the points raised in Stephanie's appeal is another violation of BCBS's fiduciary duties and claims procedure responsibilities under ERISA. 29 C.F.R. §2560.503-1(g)(i), and (iii). Again, it was impossible for Stephanie to meaningfully and intelligently understand the basis for BCBS's denial of Miles's claim without knowing exactly what BCBS's rationale was in concluding that his conditions did not meet medical necessity criteria and what evidence existed to support that rationale. Stephanie was ". . . left to shoot at a cloaked target" and was not able to provide arguments and evidence that effectively addressed BCBS's basis for denial of the claims. "The need for clear notice pervades the ERISA regulatory structure." Bard v. Boston Shipping Assn., 471 F.3d 229, 237 (1st Cir. 2006).

The need for BCBS to provide an explanation for its decision is reiterated in 29 C.F.R. §2560.503-1(i)(5), (j)(3), and (j)(5). Those sections of the ERISA's claims procedure regulations require BCBS to provide Plan participants and beneficiaries with access to, and copies of, all documents, records, and other information relevant to the claim for benefits, including how BCBS had applied the terms of the Plan to Miles's claim.

Where ERISA plan fiduciaries fail to comply with ERISA's claims procedures, the regulations spell out the consequence. The language of 29 C.F.R. §2560.503-1(l) calls for a *de novo* standard of review where there is a failure to satisfy ERISA's claims procedure requirements. The First Circuit makes clear in Rucker v. Lee Holding Co. 471 F.3d 6 (1st Cir. 2006) that ERISA's unambiguous claims processing regulations, promulgated by the Department

of Labor as directed by Congress, are binding on courts and require deference to the regulations. Id, at 11 (1st Cir. 2006).

## II. BCBS MAY NOT RAISE NEW BASES FOR DENIAL OF MILES' CLAIM IN LITIGATION

BCBS is wrong when it states that it provided sufficient information to Stephanie to allow her to understand why BCBS believed Miles' conditions did not meet medical necessity. It appears to recognize the shortcomings of its denials because BCBS provides for the first time in litigation numerous bases for denial not raised during the pre-litigation appeal process.

BCBS alleges both in its Statement of Facts and in its opening memorandum, that Stephanie failed to pre-certify the treatment (BCBS Statement of Facts, ¶¶11-13, BCBS opening memo, p. 3), and that the treatment was excluded because it was provided in "an educational setting" (BCBS Statement of Facts, ¶ 25, BCBS opening memo, p. 3). BCBS may not raise for the first time in litigation bases for denial that were not raised during the appeal process. Glista, 378 F.3d at 129 (1st Cir. 2004). *See, also*, Plaintiffs' Responses to Blue Cross Statement of Facts, filed concurrently with this Opposition Memo.

The goal of ERISA's requirements was discussed in Glista:

> Those goals are undermined where plan administrators have available sufficient information to assert a basis for denial of benefits, but choose to hold that basis in reserve rather than communicate it to the beneficiary. Such conduct prevents ERISA plan administrators and beneficiaries from having a full and meaningful dialogue regarding the denial of benefits.

Id, 378 F.3d at 129. The court in Glista declined to consider a *post hoc* basis for denial and when the insurer in that case argued that internal documents in the record demonstrated that the insurer and the reviewers were, at least to some extent, thinking about the basis raised for the first time in litigation, the court held that "internal documents cannot satisfy ERISA's requirement that the specific reasons for the denial *be articulated to the claimant*." Id, 378 F.3d at 130 (emphasis

9

added). *See also*, Quinlisk v. Unum Life Ins. Co. of Am., 2009 U.S. Dist. LEXIS 127197, *34 (D. Mass. 2009) ("In reviewing a plan administrator's decision, the Court may only consider those rationales that were specifically articulated in the administrative record as the basis for denying a claim").

Other Circuits across the country have been equally direct in holding that justifications for denials may not be raised for the first time in litigation, with the court's review being limited to the materials and information contained in the pre-litigation record[3]. The Eighth Circuit stated:

> the reason for this rule is apparent – '[w]e will not permit ERISA claimants denied the timely and specific explanation to which the law entitles them to be sandbagged by after-the-fact plan interpretations devised for purposes of litigation.'

Marolt v. Alliant Tech Systems, Inc., 146 F.3d 617, 620 (8th Cir. 1998). *See also*, Bard, 471 F.3d at 244 (1st Cir. 2006) (same).

> A member of an [ERISA plan] is entitled to notice from the [plan] of the reason for the denial of a benefit. There are at least two reasons for the requirement. First, notice can provide the member with information necessary for him or her to know what he or she must do to obtain the benefit. Second, if the HMO persists in its denial, notice can enable the member effectively to protest that decision. As the Eighth Circuit put it, "The purpose of [the "full and fair review"] requirement is to provide claimants with enough information to prepare adequately for further administrative review or an appeal to the federal courts." *DuMond v. Centex Corp.*, 172 F.3d 618, 622 (8th Cir. 1999); *see also Richardson v. Central States, Southeast and Southwest Areas Pension Fund*, 645 F.2d 660 (8th Cir. 1981) [1]; *cf. Marolt v. Alliant Techsystems, Inc.*, 146 F.3d 617, 620 (8th Cir. 1998) ("We will not permit ERISA claimants denied the timely and specific explanation to which the law entitles them to be sandbagged by after-the-fact plan interpretations

---

[3] Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co., 491 F.3d 1180, 1190 (10th Cir. 2007), King v. Hartford Life & Acc. Ins. Co., 414 F.3d 994, 999 (8th Cir. 2005); Kosiba v. Merck & Co., 384 F.3d 58, 69 (3rd Cir. 2004); Juliano v. HMO of N.J., Inc., 221 F.3d 279, 288-289 (2nd Cir. 2000); Vega v. National Life Ins. Servs., 188 F.3d 287, 300 (5th Cir. 1999); Miller v. United Welfare Fund, 72 F.3d 1006, 1071 (2nd Cir. 1995); Taft v. Equitable Life Assurance Soc'y, 9 F.3d 1469, 1472 (9th Cir. 1993).

devised for purposes of litigation."); *Booton v. Lockheed Med. Benefit Plan*, 110 F.3d 1461, 1463 (9th Cir. 1997) ("In simple English, what [29 C.F.R. § 2560.503-1(f)] calls for is a meaningful dialogue between ERISA plan administrators and their beneficiaries.").

Juliano, 221 F.3d at 287 (2nd Cir. 2000).

Even if the Court does allow BCBS to raise the exclusion for treatment occurring in an educational, vocational, or recreational setting, the exclusion does not preclude coverage for Miles' treatment at Gateway. BCBS may have been confused about what type of facility Gateway actually was and may have believed it to be a therapeutic boarding school[4]. If that were the case, the exclusion would apply and BCBS would be correct in denying coverage for Miles' care. In fact, Miles did attend a therapeutic boarding school when he left Gateway. The Plan exclusion does not apply to the type of treatment provided at Gateway. *Therapy* is the primary focus in a residential treatment facility and that treatment and level of care are covered under the Plan.

### III. MILES' CONDITIONS MET THE INTERQUAL CRITERIA FOR "SYMPTOMS/BEHAVIORS"

BCBS maintains that its decision-making and review processes were reasonable and complied with the terms and requirements of the Plan and the InterQual® criteria and that Miles' was ineligible for coverage because his conditions did not meet the criteria for "symptoms/behaviors." This Court has little information before it to evaluate in determining whether BCBS's decision did, in fact, correctly interpret and apply the actual criteria in light of

---

[4] A therapeutic boarding school (TBS), alternatively know as an emotional growth boarding school, is a boarding school based on the therapeutic community model that offers and educational program together with specialized structure and supervision for students with emotional and behavioral problems, substance abuse problems, or learning difficulties. In contrast with residential treatment programs, which are more clinically focused and primarily provide Behavior therapy and treatment for adolescents with serious issues, the focus of a TBS is toward emotional and academic development. www. Wikipedia.org (last viewed 8/25/14)

its failure to provide any rationale or explanation whatsoever during the appeal process. Now, for the first time in litigation, BCBS and its reviewers' rely on conditions not included in, or required by the criteria, but BCBS continues to insist that it processed the claims and applied the criteria correctly.

BCBS, throughout its opening memo, argues that because Miles' did not have "acute symptoms or profound impairment" and was not suicidal or homicidal, he did not meet the criteria for residential treatment. There is no reference in the criteria to "acute symptoms or profound impairment." Nor is there any reference in the criteria to a patient being suicidal or homicidal. In fact, the two threshold considerations for residential treatment care are found under "Clinical Indications." The first verifies that the patient has a current psychiatric diagnosis and either has potential for improvement in symptoms or treatment is anticipated to maintain symptoms or behavior without further deterioration. BCBS has not alleged that Miles did not meet the first component of the "Clinical Indications."

The second part of "Clinical Indications" is the part of the criteria that BCBS has maintained throughout that Miles doesn't meet: "Symptoms/Behavior."

- Chronic/Persistent danger to self/others, **ALL**
  *Behaviors, **ONE**
  　*Fire setting
  　*Self-mutilation
  　*Runaway for more than **24h**
  　*Daredevil/impulsive behavior
  　*Sexually inappropriate/aggressive/abusive
  　*Behaviors unmanageable
  　　*Angry outbursts/Aggression
  　　*Positive psychotic symptoms
  　　*Habitual substance use, **ONE**
  　　　*Anxiety *and* associated symptoms increasing
  　　　*Depressed/Irritable mood *and* associated
  　　　　symptoms increasing
  　*Arrest/Confirmed illegal activity
  　*Persistent violation of court orders

12

*Behaviors present at least **6 mos**
*Behaviors expected to persist long thatn **1 yr w/o** treatment

AR000189 (emphasis in original).  In order to meet the criteria under "Symptoms/Behavior," Miles needed to be manifesting chronic conditions which were dangerous to himself or others and meet *one* of the three behavioral requirements:  engaging in one of the specific behaviors listed, have behaviors that had persisted for at least 6 months, or have behaviors that were expected to persist for more than a year without treatment.  Not only did Miles easily meet the required threshold under "Symptoms/Behavior," he exhibited at least half of the specific behaviors listed as well.  Noticeably absent from the criteria under "Symptoms/Behaviors" is any reference to the need for Miles to be suicidal, homicidal, in order to be a candidate for residential treatment.

Stephanie provided extensive documentation to demonstrate that Miles had had problems since infancy in her appeal (AR000402-892).  By the age of 3, Miles' teacher requested a psychiatric evaluation for him in light of his impulsivity, aggression, fearfulness and difficulty in relating to his peers.  AR000403.  Miles was evaluated by his local school district at the age of 4 to help him with his anxiety and rigidity.  AR000404.  He was nearly expelled from preschool for aggression towards the other children and for biting a teacher.  *Id.*  Miles continued to behave aggressively toward other children and to engage in impulsive and uncontrollable behavior.  *Id.*  Stephanie home-schooled Miles for a year because his local school was unable to cope with his behavioral issues.  *Id.*  Stephanie continued to seek professional and clinical help for Miles and he began treating with psychiatrists who tried various medication regimens with limited success.  AR000405.  Miles participated in a clinical study on Pediatric Bipolar Disease but he ultimately had to leave that program because of his age (7 years old) and the proposed dosages of proposed medications which were inappropriate for a child his age.  *Id.*

Miles attended junior high school with a full time one-on-one aide who had to meet him at the curb when Stephanie dropped him off at school in the morning and stay with him all day long until Stephanie returned to pick him up. *Id.* Miles' aggressive behavior escalated during his junior high years, particularly with family members, and he refused to go to school. *Id.* Stephanie had to call the police when Miles kicked a hole in the wall at home. *Id.* Miles continued to receive therapeutic services and medications but his aggressive behavior again escalated in 2010. He attacked both his mother and father and was arrested on two occasions. AR000406.

Miles began an intensive outpatient program but admitted he was only pretending to take the prescribed medication. *Id.* He engaged in disturbing and inappropriate sexual behaviors, including gestures, comments and threats towards his brother. *Id.* He spent three nights in juvenile detention after attacking his father. The court ordered, as a condition of Miles' probation, that he take his prescribed medication. However, immediately after his return home, Miles again refused to comply. *Id.*

Stephanie realized that Miles' behaviors were uncontrollable and she began to look for more intensive treatment options. *Id.* Miles was admitted to Aspiro, a wilderness program, where he was diagnosed with Asperger's Disorder, Anxiety Disorder and Depressive Disorder. *Id.* Miles' therapists at Aspiro strongly recommended ongoing intensive treatment for Miles when he finished that program. He was admitted at Gateway on January 18, 2011, where he was treated until August of 2012. Miles had significant struggles during his treatment at Gateway in learning to manage his behaviors. He experienced angry outbursts, behaved aggressively at times, threatened to kill himself or engaged in self-harm behavior, and acted out in sexually inappropriate ways   *See*, Plaintiffs' Rule 56.1 Statement, ¶¶ 37 -54.

Stephanie's appeal included, among other things, medical records from not only Gateway and Aspiro, but also prior records from Miles' therapists and physicians, school records, and documents recording Miles' legal problems.  BCBS's denials made no reference whatsoever to the materials provided by Stephanie, nor did it respond to the arguments made in her appeal.  It simply maintained, and continues to maintain, that Miles did not meet criteria for "Symptoms/Behaviors" and that its review process comprised a "full and fair" review of the claim.  In light of the information provided by Stephanie documenting Miles chronic and severe conditions, BCBS' decision to deny benefits for Miles' treatment was an abuse of discretion.

## CONCLUSION

Miles' extensive history of failed therapeutic interventions prior to his admission at Gateway, his escalating aggression and violent behavior, his legal difficulties and his academic failures provide ample evidence of his need for the structure and intensity of a twenty-hour per day/seven day a week treatment program.   Miles clearly met criteria for residential treatment under the terms of the Plan and the InterQual® criteria.

BCBS goes to some lengths to imply that Stephanie and Miles' father were parents who were simply tired of dealing with their difficult child and wanted to send him some place far away.  This implication is gratuitously insulting to Stephanie and is completely and obviously inaccurate.  Since Miles' infancy, Stephanie has moved heaven and earth to obtain appropriate treatment for her seriously troubled son.  She spent hundreds of thousands of dollars on that treatment when BCBS wrongfully refused to provide coverage for it.  Stephanie is entitled to an order from this Court that BCBS must pay the expenses associated with Miles' treatment.

DATED this 29th day of August, 2014.

       /s/ Jonathan M. Feigenbaum
      Jonathan M. Feigenbaum, Esq.

B.B.O. #546686  
184 High Street  
Suite 503  
Boston, MA 02110  
Tel. No. : (617) 357-9700  
Jonathan@erisaattorneys.com  

  s/ Brian S. King  
Brian S. King, Esq.  
Utah Bar #4610, admitted *pro hac vice*  
336 South 300 East, Suite 200  
Salt Lake City, UT 84111  
Tel. No. : (801) 532-1739  
brian@briansking.com  

**CERTIFICATE OF SERVICE**

I hereby certify that this document, filed through the ECF system, will be sent electronically to the registered participants identified by the Court and there are no non-registered participants.

  /s/ Jonathan M. Feigenbaum