# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

|  |  |
|---|---|
| **STEPHANIE C., individually and as guardian of MILES G.,** | ) ) ) ) |
| **Plaintiff,** | ) ) ) |
| **v.** | ) ) **Civil Action No. 13-13250-DJC** |
| **BLUE CROSS BLUE SHIELD OF MASSACHUSETTS HMO BLUE, INC.,** | ) ) ) ) |
| **Defendant.** | ) ) ) ) |

_____

## MEMORANDUM AND ORDER

**CASPER, J.**                                                          **March 29, 2015**

## I.     Introduction

Plaintiff Stephanie C. ("Stephanie") individually and as guardian of Miles G. ("Miles") ("Plaintiff") has brought this action against Defendant Blue Cross and Blue Shield of Massachusetts HMO Blue, Inc. ("BCBS") under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1132(a)(1)(B), challenging Blue Cross's partial denial of health insurance benefits for residential mental health treatment.  D. 1.  BCBS and Plaintiff have both moved for summary judgment.  D. 24; D. 27.  For the reasons stated below, the Court ALLOWS BCBS's motion for summary judgment, D. 24, and DENIES Plaintiff' motion for summary judgment, D. 27.

## II. Factual Background

Unless otherwise noted, all facts are undisputed and are drawn from the administrative record (cited hereinafter as "AR"), which the parties jointly filed. D. 23.

### A. Coverage Under the Plan

Miles's father is a participant in a group health benefit plan (the "Plan") sponsored by his employer, Harmonix Music Systems, Inc. ("Harmonix"), and insured by BCBS. D. 1 ¶ 1. Miles is a beneficiary of the Plan. Id. The terms of the agreement between Harmonix and BCBS are set out in their Premium Account Agreement ("PAA"). AR at 1-9. The PAA provides that:

> Blue Cross and Blue Shield is the fiduciary to whom you have granted full discretionary authority to make decisions regarding the amount, form and timing of benefits; to conduct medical necessity review; to apply utilization management; to exercise fair and impartial review of denied claims for services; and to resolve any other matter under the benefits plan which is raised by a Member or identified by Blue Cross and Blue Shield regarding entitlement to benefits as described in the Subscriber Certificates for your benefits plan. All determinations of Blue Cross and Blue Shield with respect to any matter within its assigned responsibility will be conclusive and binding on all persons unless it can be shown that the interpretation or determination was arbitrary or capricious.

AR at 2. The policy under which Miles was insured was a Preferred Blue PPO Deductible Plan, the terms of which are set out in the Preferred Blue PPO Preferred Provider Deductible Subscriber Certificate ("Subscriber Certificate"). AR at 10-123. The Subscriber Certificate provides, in part, that "[t]o receive your health plan coverage, all of your health care services and supplies must be medically necessary and appropriate for your health care needs." AR at 31 (emphasis in original). Among other things, "medically necessary" services must be "[c]linically appropriate, in terms of type, frequency, extent, site, and duration" and must be "[c]onsistent with the level of skilled services that are furnished and furnished in the least intensive type of medical care setting that is required by your medical condition." AR at 32.

With respect to mental health treatment, the Subscriber Certificate provides that the "health plan covers <u>medically necessary</u> services to diagnose and/or treat <u>mental conditions</u>." AR at 57 (emphasis in original). As such, the Plan covers acute residential treatment and other intermediate levels of mental health treatment when they are the least intensive type of setting that is required. AR at 58-59. The Subscriber Certificate provides, however, that:

> <u>No benefits</u> are provided for: psychiatric services for a condition that is not a <u>mental condition</u>; residential or other care that is custodial care; and services and/or programs that are not <u>medically necessary</u> to treat your <u>mental condition</u>. Some examples of services and programs that are not covered by this health plan are: services that are performed in educational, vocational, or recreational settings; and "outward bound-type," "wilderness," "camp," or "ranch" programs. These types of non-covered programs may be in residential or nonresidential settings. They may include therapeutic elements and/or clinical staff services as well as vocational, educational, problem solving, and/or recreational activities. These programs may have educational accreditation. The staff may include some licensed mental health providers who may provide some therapy. No benefits are provided for any services furnished along with one of these non-covered programs. For example, no benefits are provided for therapy and/or psychotherapy furnished along with one of these non-covered programs.

AR at 58 (emphasis in original). Moreover, no benefits are provided for a service that is "furnished along with [a] non-covered [service]." AR at 58. The Subscriber Certificate further provides that if a member stays in the health care facility after being informed by BCBS that "inpatient coverage is no longer medically necessary," BCBS will not provide additional coverage and the member "must pay all costs for the rest of that inpatient stay." AR at 43 (emphasis omitted). In fact, the Subscriber Certificate states that, in any event, "[t]o receive coverage for inpatient services for a mental condition, you and your mental health provider must receive approval from [BCBS] as outlined in this Subscriber Certificate before you enter a general or mental hospital or substance abuse treatment facility for inpatient care." AR at 58 (emphasis omitted).

To evaluate whether residential psychiatric care is medically necessary, BCBS conducts a utilization review applying "utilization review criteria" based on medical technology assessment criteria and medical necessity guidelines. AR at 82 (emphasis omitted). During this review, BCBS's "Behavioral Health Physician Psychologist Review Unit" uses the initial review InterQual Criteria ("InterQual Criteria"). See, e.g., AR at 400. The InterQual Criteria "is a nationally-recognized criteria set which is used to assess the level of care required by each individual." Id. The InterQual Criteria provides initial review guidelines that the physician reviewers use to determine whether the patient qualifies for admission to a treatment facility and the need for different levels of inpatient treatment. AR at 438-444.

When BCBS denies a claim, the Plan provides a grievance process which allows members to request a review of the decision. AR at 88. The Plan provides that once BCBS receives the request, it "will research the case in detail" and notify the member "in writing of the decision or the outcome of the review." AR at 89. When reviewing a grievance, BCBS will look at factors including "all of the provisions of [the] health plan" and "the policies and procedures that support [the] health plan." AR at 88. Under the Plan, "[a]ll grievances are reviewed by professionals" who did not participate in BCBS's prior decisions regarding the member's coverage. AR at 89. If after BCBS's internal formal grievance process is completed the member is denied coverage because it is determined the service was not medically necessary, the member has a right to external review by a review agency under contract with the Office of Patient Protection of the Massachusetts Department of Public Health, but such external review is not required under the Plan. AR at 91-92.

### B.     Miles's Mental Health History

Miles's mental health issues are long-standing. AR at 403. At the age of three, Miles's

behavior was unpredictable, "[h]e was aggressive toward his younger brother, clingy, fearful, and highly irritable." Id. Two months after enrollment in preschool, his teacher requested a psychiatric evaluation of Miles. Id. Miles was subsequently evaluated by Dr. Kohlenberg at Children's Hospital, who recommended a behavioral chart. Id. At age four, Miles was evaluated by the Millis school system "and was put on a home program sensory diet to try to reduce his anxiety with other children and his difficulty transitioning and relating to the other children." AR at 404. This program had limited success. Id. After being nearly expelled from another preschool for "random aggression toward other children" and for biting the school director, Miles was evaluated by Mary Bamford, an occupational therapist, and enrolled in occupational therapy services at Exeter Hospital for "sensory integration disorder." Id. Miles received these services until the age of seven, but "continued to have anxiety, low mood, impulsivity, and behavioral dysfunctions." Id.

During this period, Miles received a neuropsychological evaluation with Dr. Martha Colette, who noted Miles's "high level of anxiety." AR at 405. Miles was also evaluated by the Center for Learning and Attention Deficit Disorders and was determined not to have attention deficit disorder, but a "difficult emotional temperament." Id. Miles was also seen by two psychiatrists around this time, Dr. Gear and Dr. Burger. Id. Dr. Gear prescribed the antidepressant celexa, which was effective for two weeks but ultimately "agitated" Miles. Id. Dr. Burger indicated that "biopolar disorder may be [Miles's] diagnosis." Id.

At age seven, Miles was accepted into the Massachusetts General Hospital Study on Pediatric Bipolar Disorder where he was prescribed the "atypical antipsychotics" zyprexa and risperdal. Id. Risperdal helped to regulate Miles's mood and aggression; however, Miles ultimately had to leave the study because his medical recommendation was to increase his

risperdal dose above the study's protocol. Id. By third grade, however, Miles's medication became less effective, and Miles's doctor, Dr. Vance at Seacoast Mental Health Center ("SMHC"), added a prescription for abilify. Id. In fifth grade, a prescription for an antidepressant was also added. Id. In March 2009, at the age of thirteen, Miles's aggression increased, and Dr. Gelsomini at SMHC prescribed two new medications, geodon and depakote, but Miles suffered from side effects from the geodon and could not handle the blood draws required for depakote. AR 405-406.

In 2010, Miles was in weekly mental health therapy with Scott Brown at SMHC and saw Anita Freeman, a psychiatric prescribing nurse, who also prescribed depakote. AR at 406. Miles also sought treatment at the Health and Education Services Crisis Center in Haverhill, Massachusetts. Id. The Health and Education Services Crisis Center indicated that "Asperger's [disorder] should be considered as a diagnosis" and "recommended an intensive outpatient program." Id. On August 1, 2010, at age fifteen, Miles began attending Direction Behavioral Health IOP, but his aggression continued. Id. Miles was staying in bed all day, made inappropriate sexual comments and in September of 2010 was arrested for punching his mother. Id. Miles admitted that he had not been taking his depakote. Id. In October 2010, Miles was again arrested, this time for aggressive behavior towards his father, and received a probation order that he take his prescribed medication, but Miles continued to refuse his medication. Id.

On October 24, 2010, at age fifteen, Miles was enrolled in Vantage Point of Aspiro ("Vantage Point"), "a wilderness therapy program for teens with neurodevelopmental issues in addition to emotional, psychological and behavioral issues." Id.; AR at 689. Vantage Point's neuropschological evaluation of Miles indicated "a primary diagnosis of Asperger's disorder, with other diagnoses of Anxiety Disorder NOS and Depressive Disorder NOS." AR at 406. On

January 18, 2011, Miles was discharged from Vantage Point. AR at 689. In the discharge report, Vantage Point noted that Miles's "Discharge DSM-IV Diagnostic Impressions" were 299.80 Asperger's Disorder; 314.00 Attention Deficit/Hyperactivity Disorder Predominantly Inattentive Type; and 300.00 Anxiety Disorder NOS. AR at 692. The Vantage Point discharge report recommended that Miles's "transition to a residential treatment center (RTC) skilled in the treatment of children with special academic needs" and that Miles should continue to work with an individual therapist. AR at 693. Immediately after being discharged from Vantage Point, Miles was admitted to Gateway Academy ("Gateway"), before transferring to Summit, a therapeutic boarding school. AR at 406-407.

### C.    Gateway Academy Claims for Reimbursement

On January 18, 2011, at age fifteen, Miles was admitted to Gateway and he remained there until August 5, 2012. AR at 858. Plaintiff seeks reimbursement on behalf of Miles for residential treatment charges billed by Gateway for Miles's twenty-month stay there. D. 1 ¶¶ 5, 66.

#### 1.    Initial Claims

On April 11, 2011, three months into Miles's stay at Gateway, Harmonix submitted claims totaling $1,540 to BCBS for psychiatric evaluations and consultations conducted by Gateway on January 27, February 2, and February 23, 2011 in connection with Miles's admission. AR at 157-59; see also AR at 216. The claims were identified as claims for: (1) initial psychiatric evaluations; and (2) for a 45-50 minute outpatient psychotherapy visit. AR at 158-59; see also AR at 216. BSBC denied these claims on the grounds that Gateway is a non-covered provider. AR at 211-12. On June 10, 2011, however, BCBS paid the amount allowed under the Plan for those services. AR at 213-14. BCBS, however, notified Miles's father that

the payments would be covered "as a one time exception" and that the Plan did not cover treatment that was provided "in a school setting." D. 1 ¶ 66; AR at 214. BCBS also notified Miles's father of his appeal rights. AR at 214. On September 12, 2011, Gateway submitted claims to BCBS for $2,025. AR at 131. These charges were accrued in the month of January 2011 for "[a]ncillaries" and were denied by BCBS "because this service is not covered when performed at the location where services were received." AR at 131, 137.

### 2.    Residential Treatment Claims Submitted by Gateway

In March 2012, Gateway electronically submitted claims spanning back to the date of Miles's admission in January 2011. AR at 131, 222-34. These claims did not identify any specific procedures or treatment that Gateway had provided and identified the charges as "Residential Treatment." AR at 222-34. These residential treatment charges totaled over $175,000.00, based on a flat fee of $310.00 a day. AR at 139-41, 148-50, 223. BCBS denied these claims, indicating that the "claim[s] [did] not meet medical necessity guidelines or requested clinical information was not received," that "benefits are not available because this service . . . was submitted as an inpatient stay," and "failure to submit all the necessary information and that the information we have does not support benefits for this claim." AR 137, 144.

### 3.    Medical Necessity Review of Residential Treatment Claims

Dr. Elyce Kearns, a psychiatrist reviewer, board certified in both psychiatry and neurology and child psychiatry, initially reviewed Miles's residential treatment claims on behalf of BCBS. AR at 205-210, 220-21. Gateway's March 2012 invoices were not accompanied by a complete clinical record and, although BCBS subsequently requested and received Miles's medical records from Gateway, BCBS determined that those records were "incomplete" and

"cursory." AR at 219-20. Nevertheless, based on a review of the medical record provided by Gateway, which included Gateway's January 27, 2011 and February 2, 2011 Psychiatric Evaluation of Miles, Dr. Kearns determined that Miles's "condition [did] not meet the medical necessity criteria required for an acute residential psychiatric stay." AR at 221.

Dr. Kearns noted that Gateway's initial psychiatric evaluation indicated that Miles's parents had "not seen signs of mania" and that Miles denied having "racing thoughts, sleeplessness [or] grandiosity." Id. Dr. Kearns further noted that, although Miles had suicidal thoughts in the past, Miles had never had a plan of suicide and did not have current suicidal ideation. AR at 221, 235-36. The record further indicated that Miles had "no neurovegetative signs of depression," "no significant substance abuse," no significant ADHD symptoms and no self-harm. AR at 221. Furthermore, no medications were recommended at the time of Miles's admission to Gateway and Miles had just successfully completed a three-month wilderness program. AR at 221, 240. Based on the record, Dr. Kearns concluded that Miles "was not showing significant, acute [symptoms] to warrant [acute residential treatment] admission." AR at 221.

On May 25, 2012, Dr. Kearns sent letters to Plaintiff and to Miles's doctor with the results of her medical necessity review for Miles's stay at Gateway. AR at 399-400. The denial letter was signed by Dr. Kearns and indicated her position as a "Physician Reviewer." AR at 399. The denial letter explained that InterQual Criteria had been "used to assess the level of care required" and that BCBS's "Behavioral Health Physician Psychologist Review Unit" had reviewed the clinical information provided and had determined that Miles's "clinical condition does not meet the medical necessity criteria required for an acute residential psychiatric stay in the area of symptoms/behaviors." Id. Dr. Kearns concluded, however, that Miles's condition

did meet the "InterQual Criteria for treatment at outpatient therapy visits level of care." Id.  The letter further informed Plaintiff of their right to appeal the decision.  Id.

4.      *Appeal of Medical Necessity Decision*

On April 10, 2013, at the request of Miles's parents, BCBS's legal department sent Plaintiff BCBS records concerning Miles's claim.  AR at 890.  On May 20, 2013, Plaintiff appealed BCBS's denial of the Gateway claims, providing additional detail regarding Miles' medical history, school information and other records regarding Miles's treatment.  AR at 401-17, 435-892, 897.  Plaintiff submitted a letter summarizing the grounds for the appeal, AR at 402-17, as well as an additional 475 pages of records and other documents.  AR at 435-892, 897.

On appeal, a second psychiatrist reviewer, Dr. Kerim Munir, reviewed the supplemented record, the faxed facility summary and BCBS's clinical notes.  AR at 897.  Dr. Munir, who is board certified in psychiatry, had not been involved in the previous review of Miles's Gateway claims. AR at 195-204, 898.  After review, Dr. Munir upheld the denial of benefits.  Id.  Dr. Munir noted that immediately prior to his stay at Gateway, Miles had spent three months at the Aspiro wilderness program and that Miles had no acute symptoms, no suicidal or homicidal ideation, no psychosis and only minor mood swings.  AR at 897.  Dr. Munir ultimately concluded that Miles's condition met the "InterQual Criteria for treatment at outpatient therapy visits level of care" but not for acute residential treatment.  Id.

On June 19, 2013, Natalie Rose-Roach, a case specialist in BCBS's Member Grievance Program, sent Plaintiff a letter summarizing the results of Dr. Munir's review.  AR at 898-900. The letter explained that "[a]n actively practicing physician who is board certified in Child Psychiatry and Psychiatry," and who did not take part in the previous decisions, determined that Miles's "clinical condition [did] not meet the medical necessity criteria required for an acute

residential psychiatric stay in the area of symptoms/behaviors." AR at 898. The letter further noted BCBS's conclusion that Miles's plan would have provided coverage for treatment at outpatient therapy visits level of care. Id. BCBS further explained that the internal grievance process was complete, but that Plaintiff had the right to seek review from the Commonwealth of Massachusetts Health Policy Commission's Office of Patient Protection. AR at 899; see also AR at 90-92. Plaintiff did not appeal to the state agency. D. 33 ¶ 59.

## III. Procedural History

Plaintiff instituted this action on December 23, 2013. D. 1. BCBS filed their answer on April 21, 2014. D. 8. The parties subsequently filed cross motions for summary judgment. D. 24; D. 27. The Court heard the parties on the pending motions and took these matters under advisement. D. 37.

## IV. Discussion

### A. Standard of Review

In an ERISA benefits case, "where review is based only on the administrative record before the plan administrator . . . summary judgment is simply a vehicle for deciding the issue." Orndorf v. Paul Revere Life Ins. Co., 404 F.3d 510, 517 (1st Cir. 2005). The Court "sits more as an appellate tribunal than as a trial court" and "evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary." Leahy v. Raytheon Co., 315 F.3d 11, 18 (1st Cir. 2002). Thus, in this context, "the factual determination of eligibility for benefits is decided solely on the administrative record, and 'the non-moving party is not entitled to the usual inferences in its favor.'" Bard v. Boston Shipping Ass'n, 471 F.3d 229, 235 (1st Cir. 2006) (quoting Orndorf, 404 F.3d at 517).

*1.     Whether Abuse of Discretion or De Novo Review Should Be Applied*

As a threshold matter, the parties disagree about the appropriate standard of review that should apply in this case.  D. 26 at 4; D. 28 at 2.   The Supreme Court has determined that "a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  <u>Firestone Tire & Rubber Co. v. Bruch</u>, 489 U.S. 101, 115 (1989).  If the benefit plan grants the administrator the requisite discretionary authority, however, "the administrator's decision must be upheld unless it is arbitrary, capricious or an abuse of discretion."  <u>Wright v. R.R. Donnelley & Sons Co. Group Benefits Plan</u>, 402 F.3d 67, 74 (1st Cir. 2005) (internal quotation marks and citation omitted); <u>Diaz v. Seafarers Int'l Union</u>, 13 F.3d 454, 456 (1st Cir. 1994).  "[A] benefits plan must clearly grant discretionary authority to the administrator before decisions will be accorded the deferential, arbitrary and capricious, standard of review."  <u>Rodriguez-Abreu v. Chase Manhattan Bank, N.A.</u>, 986 F.2d 580, 583 (1st Cir. 1993) (citation omitted).   "But if the court determines that the plan administrator operated under a conflict of interest in reviewing the participant's claim, the court must weigh such conflict as a factor in determining whether the plan administrator's denial of benefits was an abuse of discretion."  <u>Jon N. v. Blue Cross Blue Shield of Massachusetts</u>, 684 F. Supp. 2d 190, 198-99 (D. Mass. 2010).

a.   <u>The Plan Reflects a Clear Grant of Discretionary Authority</u>

Here, the initial question is whether the provisions to the Plan "reflect a clear grant of discretionary authority to determine eligibility for benefits."  <u>Leahy</u>, 315 F.3d at 15 (citation omitted).  As noted above, the Plan PAA unmistakably grants BCBS "full discretionary authority to make decisions regarding the amount, form and timing of benefits" and "to conduct medical

necessity review." AR at 2. The PAA explains further that "[a]ll determinations of [BCBS] with respect to any matter within its assigned responsibility will be conclusive and binding on all persons unless it can be shown that the interpretation or determination was arbitrary and capricious." Id. This language represents a clear grant of discretionary authority.

Nevertheless, Plaintiff argue that because this discretionary language was not contained in the Subscriber Certificate – the document that is regularly made available to Plan participants and beneficiaries – Plaintiff were not provided with sufficient notice of BCBS's discretionary authority. D. 28 at 2-4. Consequently, Plaintiff asserts that the appropriate standard of review is *de novo*. Id. The Subscriber Certificate does provide, however, that BCBS "decides which health care services and supplies that you receive (or you are planning to receive) are medically necessary and appropriate for coverage." AR at 31 (emphasis omitted). This language, especially in combination with the language in the agreement between BCBS and the employer, is sufficient to grant BCBS discretionary authority and to notify participants of BCBS's right to make coverage determinations.[1] See e.g., Island View Residential Treatment Ctr., Inc. v. BlueCross BlueShield of Massachusetts, Inc., No. 07-cv-10581-DPW, 2007 WL 4589335, at *17 (D. Mass. Dec. 28, 2007) (relying on similar language in a contract between the insurer and an employer, as well as a Subscriber Certificate, to determine that review should be conducted

---

[1]In further support of her argument, Plaintiff cites Gross v. Sun Life Assurance Co. of Canada, 734 F.3d 1 (1st Cir. 2013) for the proposition that any grant of discretionary authority must be contained in Plan documents that are distributed or routinely made available to Plan participants. D. 28 at 2-3. Gross did not address, however, where grants of discretionary authority must be contained, but held only that the phrase "[p]roof must be satisfactory to [us]" did not "state with sufficient clarity 'that the plan administrator is to make a judgment largely insulated from judicial review by reason of being discretionary.'" Gross, 734 F.3d at 14-16 (quoting Herzberger v. Standard Ins. Co., 205 F.3d 327, 332 (7th Cir. 2000)); see also Downey v. Aetna Life Ins. Co., No. 12-cv-10144-RWZ, 2013 WL 6147202, at *2 & n.5 (D. Mass. Nov. 22, 2013) (applying arbitrary and capricious standard of review where the Plan language provided for discretionary authority to determine benefits and explaining that Gross was "easily distinguishable").

under the arbitrary and capricious standard); <u>Smith v. Blue Cross Blue Shield of Massachusetts, Inc.</u>, 597 F. Supp. 2d 214, 219 (D. Mass. 2009) (relying on the premium account agreement between the insurer and the employer and medical necessity language in a Subscriber Certificate to find a grant of discretionary authority); <u>Jon N.</u>, 684 F. Supp. 2d at 199 (same). Indeed, this Court has previously concluded that language similar to the language contained in the Subscriber Certificate at issue here was sufficient to grant discretionary authority to a claims administrator. <u>Bonanno v. Blue Cross & Blue Shield of Massachusetts, Inc.</u>, No. 10-cv-11322-DJC, 2011 WL 4899902, at *7 (D. Mass. Oct. 14, 2011) (finding clear discretionary authority where the plan documents stated that the claim administrator "decides which health care services are <u>medically necessary</u> and appropriate for you") (emphasis in original) (citation omitted). Accordingly, the Court will review BCBS's decision with regard to Miles's residential treatment claims under the arbitrary and capricious standard rather than subject BCBS's decision to *de novo* review.

### b. <u>Alleged Conflict of Interest and Procedural Irregularities</u>

Next, Plaintiff argue that BCBS operates under a conflict of interest because it is both the decision maker and the funding source and, therefore, this Court should apply an increased level of scrutiny. D. 28 at 4; <u>see</u> <u>Denmark v. Liberty Life Assurance Co. of Boston</u>, 566 F.3d 1, 9 (1st Cir. 2009) (noting that "courts are duty-bound to inquire into what steps a plan administrator has taken to insulate the decisionmaking process against the potentially pernicious effects of structural conflicts," and these conflicts must "be accorded weight – albeit not necessarily dispositive weight – in the standard-of-review equation"). Plaintiff further argues that "serious procedural irregularities require a significant increase in scrutiny." D. 28 at 4.

### 1) Conflict of Interest

As an initial matter, this case presents no conflict of interest as to BCBS's duties and

responsibilities.[2]  AR at 2 (explaining that Harmonix "will be solely responsible" for complying with "fiduciary responsibilities of administering [Harmonix's] benefits plans, maintaining adequate funding to support these plans and providing required notices to Members" as mandated by ERISA).  Under the PAA, BCBS is only "granted full discretionary authority to make decisions regarding the amount, form and timing of benefits" and other claims-based decisions, not to make payments of claims out of plan assets.  Id.  Under the PAA, BCBS's responsibility, therefore, is that of claims administrator only.

### 2) Procedural Irregularities

Finally, Plaintiff contends that "serious procedural irregularities require a significant increase in scrutiny."  D. 28 at 4.  In essence, Plaintiff argue that BCBS's lack of "meaningful response or analysis" in denying Plaintiff' claims violated "both BCBS's fiduciary duty to Stephanie and Miles and the claims procedure regulations underlying ERISA."  D. 28 at 4-6.

Under ERISA, however, "[s]o long as the plan participant is provided a sufficient explanation to formulate further challenges to the denial, it is not necessary for an administrator to provide 'the reasoning behind the reasons.'"  Mercier v. Boilermakers Apprenticeship & Training Fund, No. 07-cv-11307-DPW, 2009 WL 458556, at *17 (D. Mass. Feb. 10, 2009)

---

[2]At the motion hearing, BCBS asserted that there could be no conflict of interest in this case because Harmonix, not BCBS, is the ultimate payer of benefits under the terms of the Plan. The terms of the contract between Harmonix and BCBS are set out in the PAA.  AR at 1-9.  The Court agrees that there is no conflict of interest in this case.  In addition, however, the Subscriber Certificate here made clear that external review was available as part of BCBS's grievance program.  AR at 90-92.  Moreover, both the May 25, 2012 and June 19, 2013 denial letters explicitly informed Plaintiff of their right to seek formal external review of the denial from the Commonwealth of Massachusetts Health and Policy Commission's Office.  AR at 399, 898-99. This is an "active step[]" taken "to reduce potential bias and to promote accuracy," and Plaintiff has not otherwise met their burden of showing an actual conflict of interest.  Jon N., 684 F. Supp. 2d at 199 (quoting Metro. Life Ins. Co., 554 U.S. at 117) (internal quotation mark omitted); see also Island View, 2007 WL 4589335, at *18 (noting that "a true conflict must exist: a chimerical, imagined, or conjectural conflict will not strip the fiduciary's determination of the deference that otherwise would be due") (citation and internal quotation mark omitted).

(quoting <u>Gallo v. Amoco Corp.</u>, 102 F.3d 918, 922 (7th Cir. 1996)). Here, BCBS letters dated May 25, 2012 (initial letter from Dr. Kearns denying coverage for residential treatment) and June 19, 2013 (second denial letter from a BCBS case specialist summarizing the results of Dr. Munir's review) explained that that InterQual Criteria had been "used to assess the level of care required" and that Miles's "clinical condition does not meet the medical necessity criteria required for an acute residential psychiatric stay in the area of symptoms/behaviors." AR at 399, 898. Furthermore, on April 10, 2013, Plaintiff was provided with the entire claim file in advance of their appeal, including a copy of the InterQual Criteria and BCBS's clinical notes. AR at 890. Information provided to Plaintiff not only referenced the InterQual Criteria, but explained that "[i]n applying these criteria to each case, we assess symptoms/behaviors, current psychiatric diagnosis and potential, social risk, and functioning in determining the level of care required." AR at 399.

These documents gave Plaintiff the reason for the denial of benefits. BSCS is not required "to explain why it is a <u>good</u> reason." <u>Gallo</u>, 102 F.3d at 923 (emphasis in original); <u>see</u> <u>Bonanno</u>, 2011 WL 4899902, at *10 (quoting <u>Terry v. Bayer Corp.</u>, 145 F.3d 28, 39 (1st Cir. 1998) (concluding that when explanation "letters reference[] the relevant specific plan requirements for receiving coverage for medically necessary services and the InterQual criteria to meet the medical necessity test" they provide a sufficient explanation)); <u>see also</u> <u>Island View</u>, 2007 WL 4589335, at *21 (finding sufficient letters explaining treatment was not covered because it could have been provided in a less intensive setting and the program did not provide certain evaluation and also explaining broadly the reasons benefits were denied); <u>Smith</u>, 597 F.Supp.2d at 223 (finding sufficient a letter stating that "[p]laintiff's benefits claim was denied

because it did not meet the medical necessity criteria for inpatient stay in a mental health facility").

Plaintiff relies heavily on the fact that the appeal letter to Blue Cross was longer than Blue Cross' responses, however, BCBS was not required to respond at similar length to Plaintiff. Moreover, Plaintiff's appeal letter, and the 475 pages of supporting documents, was considered by BCBS's second psychiatrist reviewer, Dr. Munir. AR at 897. Plaintiff was free to provide any additional information or seek further external review and, in fact, several pages of Plaintiff appeal letter were titled "Medical Necessity Support." AR at 407. Nothing in the record suggests that Plaintiff was prejudiced in her ability to protest BCBS's decision.

Accordingly, for the reasons stated above, the Court reviews BCBS's denials under the arbitrary and capricious standard.

## B. BCBS's Denial of Residential Treatment Claims

### 1. *Arbitrary and Capricious Standard of Review*

The arbitrary and capricious standard of review is deferential, and therefore, "the court is not to substitute its judgment for that of the [administrator]." Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). "[T]he administrator's decision must be upheld if it is reasoned and supported by substantial evidence." Gannon v. Metro. Life Ins. Co., 360 F.3d 211, 213 (1st Cir. 2004) (citation omitted). "Evidence is substantial if it is reasonably sufficient to support a conclusion, and the existence of contrary evidence does not, in itself, make the administrator's decision arbitrary." Id. (citation omitted). The Court must decide only whether the administrator's denial of benefits was irrational, resolving any doubts in favor of the administrator. Liston v. Unum Corp. Officer Severance Plan, 330 F.3d 19, 24 (1st Cir. 2003).

There are strong policy reasons for such deference. The Supreme Court has "recognized that ERISA represents a careful balancing between ensuring fair and prompt enforcement of rights under a plan and the encouragement of the creation of such plans." Conkright v. Frommert, 559 U.S. 506, 517 (2010) (internal quotation marks and citation omitted). This deference "promotes efficiency by encouraging resolution of benefits disputes through internal administrative proceedings rather than costly litigation" and "promotes predictability, as an employer can rely on the expertise of the plan administrator rather than worry about unexpected and inaccurate plan interpretations that might result from *de novo* judicial review." Id.

> 2.   *BCBS's Denial of Miles's Residential Treatment Claims Was Not Arbitrary and Capricious and is Supported by Substantial Evidence*

The Court finds that substantial evidence supports BCBS's decision to deny Miles's residential treatment claims. The Plan clearly requires that: (1) treatment be furnished in the "least intensive" type of medical care setting that is appropriate, AR at 32, 58; (2) no benefits will be provided for services "furnished along with [a] non-covered [service]," AR at 58; and (3) coverage of acute residential treatment does not include residential "educational" programs or psychotherapy services provided along with such programs.[3] AR at 58-59.

To begin, as noted above, the terms of the Subscriber Certificate expressly state that benefits will not be provided for "services that are performed in educational, vocational, or recreational settings" even if they "include therapeutic elements and/or clinical staff services as

---

[3]The Plan also requires that all treatment for inpatient non-emergency care or for mental health care must be pre-approved in advance to be covered. AR at 41, 58. Plaintiff, who was understandably proactive in seeking treatment for Miles, did not seek pre-approval for the Gateway services. The administrative record, however, does not establish that BCBS ever articulated pre-approval as its reason for denial of Miles's residential treatment claim. Although BCBS now argues that it "could have completely denied the claim at the very start on this strictly contractual/administrative basis and foreclosed further review," BCBS "does not ask the Court to uphold Blue Cross' decision on that basis," D. 34 at 6, but makes note of same as it relates to Plaintiff's allegation that BCBS did not provide a full and fair review of the claim.

well as vocational, educational, problem solving, and/or recreational activities." AR at 58. The Subscriber Certificate also provides that "[t]hese programs may have educational accreditation." Id. There is substantial evidence in the administrative record to support BCBS's conclusion that Gateway provided its mental health services in an educational setting. See e.g., AR at 243 (Gateway "Family Progress Note") (indicating that that Plaintiff discussed "Miles's initial week at Gateway including school"). Indeed, Plaintiff does not dispute that Gateway "offers, as a component of its comprehensive services, an accredited educational program for its patients." D. 33 ¶ 14. As such, denial of Miles's Gateway residential treatment claims was rational even if only based on the fact that Miles's Plan did not allow for benefits performed at educational facilities. AR at 58. Although BCBS could have denied Miles's residential treatment claims on this basis alone, BCBS nevertheless had its medical reviewers review the merits of the claims.[4]

As discussed above, the Plan provides benefits only for "medically necessary" treatment. AR at 31. Medical necessity is determined by BCBS. Id. The Subscriber Certificate defines "medically necessary" services as those services "furnished in the least intensive type of medical care setting that is required by your medical condition," and which must be "not more costly than an alternative service or sequence of services at least as likely to produce the same therapeutic or diagnostic results to diagnose or treat your illness, injury, or disease." AR at 31-32. During

_____

[4]Plaintiff relies upon Glista v. Unum Life Ins. Co. of Am., 378 F.3d 113 (1st Cir. 2004) to argue that BCBS cannot rely on the education limitation as the basis for denying the claim because BCBS did not mention the education limitation to Plaintiff during the appeal process. D. 32 at 9. In Glista, the First Circuit refused to allow the insurer to rely on a defense raised for the first time during the court proceedings. 378 F.3d at 128. In that case, however, review of the administrative record showed that the plan administrator had never articulated the defense to the plaintiff in any communication during the review process. Such is not the case here. In her complaint, Plaintiff acknowledges that BCBS informed Miles's father that the Plan did not cover treatment that was provided "in a school setting." D. 1 ¶ 66. Nevertheless, the Court does not rely on this basis alone to conclude that BCBS's determination was neither arbitrary nor capricious.

review of the claims in this case, two psychiatrist reviewers utilized the InterQual Criteria to determine whether Miles's condition met the medical necessity criteria required for an acute residential psychiatric stay. AR at 399, 897. The reviewing doctors each concluded independently that at the time Miles was admitted to Gateway he did not have acute symptoms or severe impairment and was not a chronic or persistent danger to himself or others. AR at 221, 399-400, 897, 898-900.

The InterQual Criteria first requires reviewers to consider whether the patient's condition at the time of admission for treatment meets the requirements for "Clinical Indications." AR at 189. Therefore, Miles must meet the "psychiatric diagnosis" and the "Symptoms/Behavior" requirements based on the clinical indications "within [the] last week." Id. The "Symptoms/Behavior" requires that before admission the patient must have shown himself to be a "chronic or persistent danger to [him]self or others." Id. If the patient meets the requirements for "Clinical Indications," he must next meet the criteria for "Social Risks," which includes "Risks and Level of Care." AR at 190. The Social Risk review requires reviewers to find, in part, a record of unsuccessful treatment in the year before admission and evidence in the month before admission that the patient cannot be safely managed at a less intensive level of care. Id. Unsuccessful treatment is defined as "lack of improvement of the patient's symptoms and behaviors in prior treatment or his/her inability to complete an actual trial of treatment provided by a licensed program or clinician." AR at 192.

Here, denial of coverage was rationally based upon review of the record, which showed that Miles had been at the Aspiro wilderness program for three months immediately prior to his admission at Gateway. AR at 406. The record indicated that there had been improvement in some of Miles' symptoms and behaviors in his treatment at Aspiro, such that the psychiatric

reviewers rationally could have concluded that the program was not "unsuccessful" within the meaning of the criteria. See e.g., AR at 689-95 (Aspiro "Discharge Summary and Recommendations"). For example, Aspiro's discharge report noted that in the area of "Emotional Regulation," although he was still working on a number of issues, Miles "showed increasing ability to express himself and engage in emotional problem solving over time" and an "increasing ability to deal with frustration and disappointment." AR at 691. Similarly, in the area of "Behavioral Regulation" the discharge summary indicated that Miles "developed a better ability at managing his behaviors" and that "[h]e reduced his inappropriate talk and impulsive behaviors." Id.

Moreover, the InterQual Criteria for "Psychiatric Subacute Care, Functioning" requires that the patient has been discharged or transferred from a psychiatric hospital within twenty-four hours prior to admission to an psychiatric residential treatment center and also presents one of four listed sub-conditions: "medication refractory/resistant and severe psychiatric symptoms persist," "profound functional impairment," "unable to maintain behavioral control for more than 48 hours and improvement is not expected within the next two weeks," or "hostile/intimidating interactions." AR at 190. In this case, as mentioned above, Miles entered Gateway immediately upon leaving Aspiro, which was neither a hospital nor a subacute treatment center. Furthermore, the record shows that Miles had shown some improvement in his behavioral control in the Aspiro program immediately before admission to Gateway. As such, the Court concludes that there was substantial evidence in the administrative record supporting the psychiatrist reviewers conclusions that Miles's condition met the "InterQual Criteria for treatment at outpatient therapy visits level of care" but not for acute residential treatment.

For all these reasons, BCBS's determination was neither arbitrary nor capricious and was supported by substantial evidence.

**V.        Conclusion**

For the foregoing reasons, the Court ALLOWS BCBS's motion for summary judgment, D. 24, and DENIES Plaintiff's motion for summary judgment, D. 27.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge